909 A.2d 736 (2006)
388 N.J. Super. 485
STATE of New Jersey, Plaintiff-Respondent,
v.
Amy ELDRIDGE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 2006.
Decided November 1, 2006.
*737 Stephen P. Hunter, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Hunter, on the brief).
Joie Piderit, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Acting Attorney General attorney; Ms. Piderit, on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and BAXTER.
The opinion of the Court was delivered by
BAXTER, J.S.C. (temporarily assigned).
Defendant Amy Eldridge was found guilty of two counts of second degree vehicular homicide in violation of N.J.S.A. 2C:11-5 for recklessly causing the death of her two passengers by operating her vehicle while intoxicated and crashing into a tree. The Court sentenced her to two concurrent terms of eight years in the custody of the Commissioner of the Department of Corrections of which 85% was required to be served without eligibility for parole.
On appeal, defendant argues:
I. DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE JUDGE'S ERRONEOUS JURY INSTRUCTION VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMEND. V, VI, XIV; N.J. CONST. ART. I, PARA. 1, 9, 10.
II. DEFENDANT'S SENTENCE TO EIGHT YEARS IN PRISON VIOLATED HER SIXTH AMENDMENT RIGHT TO TRIAL BY JURY PURSUANT TO BLAKELY V. WASHINGTON, 542 U.S. 296, 124 S.CT. 2531, 159 L.Ed.2d 403 (2004); U.S. CONST. AMEND. V, VI, XIV; N.J. CONST. ART. I, PARA. 1, 9, 10 (NOT RAISED BELOW).
III. IMPOSITION OF AN EIGHT-YEAR NERA SENTENCE ON A YOUTHFUL, NON-VIOLENT, FIRST TIME OFFENDER WAS EXCESSIVE WHERE THE JUDGE IMPROPERLY RELIED UPON AGGRAVATING FACTORS NOT SUPPORTED BY THE RECORD AND IGNORED MITIGATING FACTORS CLEARLY PRESENT IN THE RECORD. U.S. CONST. AMEND. VI, XIV; N.J. CONST. ART. I, PARA. 1, 9, 10.
Because the judge failed to specifically instruct the jury that it could find the defendant not guilty if it concluded that the actions of her front seat passenger constituted an intervening cause of the crash, we reverse Eldridge's conviction.

I.
On November 11, 1999, at approximately 2:30 a.m. on a clear dry night, the defendant, then 18 years of age, was the driver in a single car motor vehicle accident on Asbury Road in Howell Township. After leaving the road, her car traveled eighty-six feet until it struck a tree. The two passengers in the car, Vasil Green, in the front seat, and Waylon Biernacki, in the rear seat, were killed as a result. Defendant suffered serious injuries including a fractured hip and jaw. A forensic scientist determined that, at approximately 4:00 a.m., defendant's blood alcohol content was .175%.
*738 Patrolman Timothy Kohan, the officer who responded to the crash, described Asbury Road as a rural or semi-rural county road with a single lane in each direction. When Kohan arrived at the scene at approximately 2:34 a.m., he observed that Eldridge's vehicle had hit a tree and was resting in the southbound lane of traffic facing north. Kohan noted that the defendant was in the driver's seat, yelling and screaming. Green was in the front passenger seat, breathing but unconscious, and Biernacki was in the back seat, also unconscious but breathing.
Noting that there was an odor of alcohol coming from the driver's breath, Kohan gave that information to his supervisor upon arrival. He also filled out a drinking/driving report. A five liter sized box of wine was later found in the trunk of the vehicle by another officer.
Corporal Joseph Fiore, a twenty-one year veteran of the Howell Police Department and a traffic safety officer, arrived at the scene at approximately 2:45 a.m. on November 11. During his testimony, he noted that there were no skid marks leading up to the tree. He explained that the tire impression led in a straight line, slightly diagonally, from the road directly to the point of impact. While he was unable to ascertain how fast the vehicle was traveling before the crash, he concluded that there was no indication that the vehicle was speeding.
Dr. Sogra Saleem of the county medical examiner's office testified that Green and Biernacki had each died from injuries sustained in the crash.
Dr. John Brick, a biological psychologist, testified as an expert on behalf of the State to the amount of alcohol defendant had consumed and its impact on her operation of the vehicle. He opined that he was able to determine, based on statements by the defendant, police and autopsy reports, as well as lab reports, that the defendant had consumed twenty-seven ounces of alcohol prior to the accident.
Based on the assumption that defendant began to drink at midnight and that she had consumed a total of twenty-seven ounces of wine, and based on the further assumption that she had food in her stomach at the time of the crash, Dr. Brick calculated that her blood alcohol content would have been between .16% and .19% at the time she crashed her car into the tree.
Dr. Brick explained to the jury that a driver's ability to safely control his or her vehicle would be impaired even when the blood alcohol level is as low as .02% and .03% and that even at these levels there is an increase in the relative risk for a crash. He further stated that by the time the level reaches .08% or .09%, virtually all drinkers experience some level of impairment. By the time the blood alcohol level reaches .15%, "[a person is] highly impaired in terms of [his or her] ability to drive" and "at a significantly increased risk for a crash."
Dr. Richard Saferstein, a forensic scientist, testified as an expert on behalf of the defendant, and opined that defendant's blood alcohol content at the time of the crash was within the then-existing legal limit. He made this determination based on the assumption that Eldridge began drinking at 12:45 a.m. and continued until 2:00 a.m. at a consistent rate. Based on his assumption that she had consumed a significant amount of food, he concluded that the intake of alcohol into her bloodstream would have been somewhat slowed. He testified that if she had taken her last drink at 2:00 a.m., and the alcohol was not absorbed until 120 minutes later, her blood alcohol level would have peaked at 4:00 a.m., the time of the blood test. He also testified that her blood alcohol level would *739 therefore have been considerably lower, namely .09% at the time of the crash.
James Eastmond, an accident reconstruction expert, also testified for the defense. Based on the type of damage that occurred, Eastmond concluded that Eldridge's car was traveling approximately 40 to 45 miles per hour at the time of impact. Eastmond explained the concept of perception response time, which is the amount of time it takes a driver to detect and identify a road hazard, and affirmatively respond to that hazard. Explaining that accepted scientific research demonstrates that the average perception response time to an unexpected event while driving is 1.5 seconds, Eastmond concluded that a car moving at 45 miles per hour, would travel about 98.95 feet on average before a driver would be able to respond to an unexpected road hazard. According to the State, the tire track on the side of the road was at the most eighty-six feet.
A week after the crash, and one day after her release from the hospital, defendant gave a statement to Detective Sergeant Reginald Grant of the Monmouth County Prosecutor's Office. With two exceptions, discussed below, Eldridge's trial testimony was similar to the statement she gave to Detective Sergeant Grant on that day.
Defendant testified that on the day of the crash, she left work at a supermarket at approximately 4:30 p.m., and went to the home of her friend, Crystal Pullen. Defendant and Pullen then went to defendant's boyfriend's home, where his parents gave them food and a large box of wine. After picking up Biernacki and Green, the four of them went to Pullen's house, where defendant took two or three beverage cups out of her car and the box of wine from her trunk. At 1:00 a.m., Eldridge poured the wine, finishing not only her own cup, but because Biernacki did not drink, she and Green drank some of his wine as well. Defendant acknowledged on cross-examination that she had consumed twenty-eight ounces in five minutes. The four of them went to a bowling alley, where they remained briefly. From there, defendant, Green and Biernacki, without Pullen, drove to Bradley Beach, leaving after only twenty minutes because of the cold weather. It was on the way home from the beach that the crash occurred.
In her statement to Detective Sergeant Grant, Eldridge commented that as soon as she, Green and Biernacki got into her car, Biernacki rested his head on his hand and Green sat back in the seat and put his head on the headrest. At trial, she repudiated that statement.
In addition to that discrepancy between her statement to Detective Sergeant Grant and her trial testimony, was her description of Green's conduct in the car that night. In defendant's statement to Grant, she never mentioned Green's conduct. It is her trial testimony about Green causing the crash which forms the factual basis for her claim on appeal of a faulty jury charge:
Q At about how long was it that you were traveling along till you hit the tree? How many minutes?
A Probably 15 minutes.
Q Okay, now are these times all approximate times?
A Yeah. approximately.
Q It could be shorter could be longer?
A Give or take a couple of minutes.
Q . . . Amy, as you sit here today, under oath, do you know what happened to cause that car to hit that tree?
A Yes.
Q Would you please tell us what happened?
A When we were driving back from the beach and we were just, you know, like *740 regular kids, just driving back from the beach. And Vasil, we were kidding around me and him. And he was tickling me a little bit, and I'm telling him, you know, stop, whatever, I'm tired, I'm not in the mood for it. And he put his hand in my face, he goes, look, look, look, like and turned my face.
Q All right; let's stop right there. You said, put his hand to your face, to which side of your face?
A To the right side of my face.
Q And did he push it?
A Yes.
Q Which direction?
A To the left.
Q And he was saying, look, look, look, is that correct?
A Yes.
Q And Waylon was in the back?
A Yes, he was in the back right.
Q Now when Vasil did that, what happened?
A I don't, I don't remember looking back, I didn't see it coming, I had no time to turn my face at all.
Q All right, so Vasil pushes your face, kidding around, and the next thing you know what happens?
A I wake up in the car.
Q Did you even see that tree coming?
A No
Q Now, Amy, when you woke up in the car what's the next thing you recollect?
A There was lights behind me.
Q And do you know who they were?
A EMT's.
When asked on direct examination what effect, if any, the wine had had on her ability to drive, she answered "none."
The first time defendant ever accused Green of causing the accident was in a conversation with her mother three weeks after her release from the hospital. Mrs. Eldridge described her daughter's emotional state after her release from the hospital as one of "total confusion," but as time passed, her daughter began to calm down and began to recollect the accident in her talks with her mother. It was during one of those conversations that defendant told her mother what happened leading up to the crash, namely that Green had pushed her head to the left while she was driving.
When asked on cross-examination why she had failed to tell Detective Sergeant Grant about Green's conduct, she explained she did not want to "disrespect the memory of [her] friend" or "bring more hurt to his family."
Ultimately, Mrs. Eldridge told Biernacki's mother what defendant had said about Green having caused the accident. That conversation occurred a few weeks after the Biernacki family had instituted a wrongful death action against Amy Eldridge in March, 2000. After learning of defendant's claims regarding Vasil's conduct, the Biernacki family filed an amended complaint naming the estate of Vasil Green as a co-defendant.
The State and the defendant presented starkly contrasting versions of how the crash occurred and what caused the death of Green and Biernacki. The State's version was that the accident which led to their deaths was caused by the defendant's reckless operation of her car. The State relied on the evidence of defendant's blood alcohol level two hours after the accident, combined with its expert's alcohol extrapolation opinion and the statement that Eldridge gave to the Monmouth County Prosecutor's Office acknowledging that she had consumed twenty-seven ounces of alcohol two hours before the crash.
*741 Eldridge's version was that Green caused the crash by distracting her and pushing her head to the left. The defense relied heavily on the opinion of its accident reconstruction expert that if defendant was driving at the speed limit of 45 miles per hour she would not have had sufficient time to react to the hazard created by Green's conduct or take steps to avoid the crash. The defendant argued that the alcohol she consumed did not affect her ability to drive safely and the accident would not have occurred but for Vasil Green distracting her seconds before the crash.

II.
We address the sufficiency of the jury charge on causation. During the charge conference, the judge read aloud the defendant's request for charge. The judge noted that in addition to asking for the standard "but-for" definition of causation, under N.J.S.A. 2C:2-3a(1), the charge request had further asked the court to:
include the language of the statute that the jury may consider whether the deaths caused here were the result of conduct too remote or accidental in its occurrence or dependent on another's conduct as to have a just bearing on the defendant in this case.
The defense attorney explained why the additional instruction on causation was necessary. He stated:
[W]e would maintain that is relevant here, first and foremost, with regard to the conduct that we have alleged occurred by Vasil Green, which obviously we're going to argue is the reason why this happened notwithstanding the alcohol consumption.
The prosecutor objected, stating "Judge, I just feel your standard charge covers that all." In response, defense counsel asserted that if the charge were to be limited to the "but-for" definition of causation, the jury would have no guidance as to how to interpret Vasil Green's conduct in the particular facts of the case.
The court declined to charge the "intervening cause" portion of the causation statute, stating:
I'm not going to charge that. . . . Certainly, you can argue . . . that she wasn't reckless in her operation of the motor vehicle. She was operating it properly. And but for the conduct of Mr. Green this would have never happened.
Under N.J.S.A. 2C:11-5, the State was required to prove beyond a reasonable doubt the following elements:
1. That defendant was driving a vehicle;
2. That the defendant caused the death of [Waylon Biernacki and Vasil Green]; and
3. That the defendant caused such death[s] by driving the vehicle recklessly.
The judge's charge on the element of causation consisted of the following instructions:
In order to find that the defendant caused Mr. Green and Mr. Biernacki's death, you must find that the victims would not have died but for the defendant's conduct.
With respect to the element of causation, N.J.S.A. 2C:2-3a provides that "[c]onduct is the cause of a result when: (1) it is an antecedent but for which the result in question would not have occurred. . . ." However, where an offense requires that a defendant's reckless conduct caused a particular result, the statute further provides that:
The actual result must be within the risk of which the actor is aware, . . . or, if not, the actual result must involve the same kind of injury or harm as the *742 probable result and must not be too remote, accidental in its occurrence or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.
[N.J.S.A. 2C:2-3c.]
The State argues that the charge given by the court was sufficient and that the additional language requested was not required. In particular, the State urges us to conclude that remote causation was not an issue at trial and that any distraction caused by Vasil Green pushing defendant's face while she was driving was not an intervening cause that broke the chain of causation, but was an entirely separate alleged cause. The State argues that the issue was simply whether defendant acted recklessly, that is, whether she consciously disregarded a substantial, unjustifiable risk that death would result from her intoxicated operation of the motor vehicle. N.J.S.A. 2C:11-5.
The State further contends that the defendant's argument confuses the issue of defendant's culpability, namely whether defendant's act of driving a car into a tree was reckless, with the issue of causation. The gravamen of the State's argument is that there was no dispute at trial about the cause of death, i.e. Green and Biernacki died from multiple severe injuries, including head trauma, which were caused by defendant's act of driving her car into a tree. According to the State, the cause of death was certain and uncontroverted. The State urges us to find that defendant's claim that Green was fooling around with her as she drove does not implicate the sort of intervening and unforeseeable consequences that would warrant a causation charge in addition to that which the court gave. The State asks us to find that "[d]efendant's claim only reaches the issue of culpability." We decline the State's invitation.
We begin our analysis by re-affirming one of the cardinal principles of criminal law, which is that correct and complete jury charges are essential to a fair trial. State v. Collier, 90 N.J. 117, 122, 447 A.2d 168 (1982); State v. Green, 86 N.J. 281, 287, 430 A.2d 914 (1981). Indeed, erroneous instructions on material issues are presumed to be reversible error. State v. Grunow, 102 N.J. 133, 148, 506 A.2d 708 (1986). If a jury instruction is faulty, arguments by a defense attorney in closing by no means serve as a substitute for proper instructions from the court. State v. Townsend, 186 N.J. 473, 499, 897 A.2d 316 (2006). Accordingly, the judge's comment to defense counsel that he was free to argue that the conduct of Vasil Green was the cause of the crash is not a substitute for a proper charge. Ibid.
Instead, it is the court's responsibility to explain the controlling legal principles and the questions the jury is to decide. Green, supra, 86 N.J. at 288, 430 A.2d 914. The need for an adequate charge on the question of causation was of critical importance in the present case because the State and the defendant offered starkly contrasting theories of causation, each supported by expert testimony.
In State v. Martin, 119 N.J. 2, 573 A.2d 1359 (1990), the Supreme Court reversed the conviction of a defendant based on an incomplete jury charge on causation. The defendant in Martin was charged with murder for setting a fire at an apartment building after an argument with one of the tenants. The defendant pointed to a number of facts in support of his argument that although he had set the fire, the physical condition of the apartment building so accelerated and intensified the fire that his conduct in setting the fire could not fairly be considered to have been the cause of the victim's death. In analyzing those *743 facts, the Supreme Court concluded that, consistent with Martin's theory, a reasonable jury might have found that the victim would not have died but for the absence of working smoke detectors, the flammability of the artificial carpeting, the doors of the apartment building being left open which created a draft that had stoked the fire, and the victim's voluntary consumption of alcoholic beverages. Id. at 17, 573 A.2d 1359.
The Supreme Court reasoned that the jury charge given by the court in Martin tracked only the State's theory of the case[1], and that the defendant was entitled to a jury charge consistent with his version of the facts:
That charge would have supplied the legal predicate, for example, for the jury to determine whether the victim's death was too remotely related to defendant's conduct in starting the fire to bear justly on his liability or on the gravity of his offense. . . . The charge could have led to acquittal or to the defendant's conviction for the lesser-included offenses of manslaughter or aggravated manslaughter, offenses on which the trial court instructed the jury.
When, as here, divergent factual versions give rise to different theories of causation, the trial court should provide the jury with appropriate instructions, depending on which version it to chooses to accept. . . . Without that charge, the jury could not properly consider the significance of defendant's version of the facts. So essential to the jury's deliberations was the charge that the failure to provide it clearly possessed the capacity to bring about an unjust result.
[Id. at 16-17, 573 A.2d 1359]
The Supreme Court determined in Martin that the trial court "failed to note a pregnant parenthetical statement at the conclusion of the model charge." Id. at 16, 573 A.2d 1359. The jury charge the court referred to provided that, "If causal relationship between conduct and result is an issue, see N.J.S.A. 2C:2-3." Ibid. The corresponding section of the model charge on vehicular homicide applicable to defendant was identical in its import, although the wording differed slightly. Causation is defined in the model jury charge on vehicular homicide: "In order to find that the defendant caused (victim's) death, you must find that (victim) would not have died but for the defendant's conduct." [Model Jury Charges (Criminal), "Vehicular Homicide (Death by Auto or Vessel)" (2002).][2] A footnote appended to that definition of causation provided, "If proximate cause is an issue, N.J.S.A. 2C:2-3c should be charged." Ibid.
The "pregnant parenthetical" the Supreme Court discussed in Martin is of equal importance here. As in Martin, supra, defendant Eldridge's trial presented the jury with different theories of causation, each supported by expert witness testimony, and the trial court was therefore obliged to provide the jury with appropriate instructions depending on which version of causation it chose to accept. If the jury had found that Vasil Green's conduct caused the crash, they had no instruction from the judge on the consequence of such a finding on their verdict. It was that same defect in the charge which caused the Supreme Court to reverse Martin's conviction.
*744 We are mindful of the fact that defendant Martin was charged with murder, which required the jury to find that he purposely or knowingly caused the death, or serious bodily injury resulting in the death of the victim, whereas defendant Eldridge was charged with recklessly causing death. We conclude that the difference between those mental states is of no moment. As the Supreme Court held in Martin, whenever a causal relationship between conduct and result is an issue, the jury must be provided with the opportunity to evaluate, under proper instructions, the competing claims about the cause of death. Nothing in the Court's opinion in Martin suggests that its holding would not apply equally to a prosecution with a reckless culpability requirement.
We also recognize the fact that in Martin, unlike here, the "but-for" test of causation under N.J.S.A. 2C:2-3a was satisfied whether the jury chose to accept the State's version of events or whether it chose instead to accept defendant's contentions. The defendant's conduct in Martin in setting the fire was an "antecedent but for which the result in question would not have occurred." N.J.S.A. 2C:2-3a(1). Under this "but-for" test, the defendant's conduct is deemed a cause of an event if the event would not have occurred without that conduct. Defendant Martin conceded that without his conduct in setting the fire, the victim would not have died. In seeking a reversal of his conviction, Martin instead relied on the additional requirement of N.J.S.A. 2C:2-3(b) that the State prove that the actual result was not too remote. The Court held in Martin that the additional language in the causation statute, which would focus the jury's attention on whether the "actual result . . . [was] too remote [or] accidental in its occurrence," N.J.S.A. 2C:2-3b, was required in order to help the jury assess whether the actual result was so attenuated in relation to the defendant's original conduct as to raise a reasonable doubt as to his guilt. The court concluded in Martin that the charge given was defective because it failed to incorporate the concept of "remote result." That instruction, the Court determined, was required by the conflicting theories on what caused the victim's death.
Here, in contrast to the defendant in Martin, defendant Eldridge's recklessness would not be the cause of the crash or of the deaths if her account of the events preceding the crash is accepted. Stated differently, if the jury accepted defendant's contentions, it would have made the following finding: no matter how reckless defendant's conduct was in operating her car while intoxicated to the extent described by Dr. Brick, any such recklessness on her part did not cause the accident, because the accident would not have occurred but for the actions of Green.
Had the jury accepted defendant's contentions and found that any recklessness which resulted from her intoxication was not the cause of the crash, the State would not have been able to prove beyond a reasonable doubt that her recklessness was an "antecedent but for which the result in question (the deaths of Green and Biernacki) would not have occurred." N.J.S.A. 2C:2-3a(1). The "but-for" causation test would exonerate defendant if the jury accepted her testimony concerning Green's conduct.
That distinction between defendant's relation to the "but-for" test as compared to Martin's in no way changes our conclusion that the charge below was faulty. We so conclude because, in keeping with the teaching of Martin, supra, whenever causation is in dispute and whenever the State and defendant offer contrasting theories of causation, the court's charge to the jury must explain the legal consequences of accepting not only the State's theory, but also the defendant's theory of causation.
*745 Here, our conclusion that the trial judge's charge failed in its obligation to provide the "road map," without which a jury "can take a wrong turn in its deliberations," Martin, supra, 119 N.J. at 15, 573 A.2d 1359, is buttressed by the specific language of the causation statute. Indeed, N.J.S.A. 2C:2-3c requires the State to prove that in addition to recklessly causing death, the actual result "must not be too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the actor's liability." [emphasis added]. The alleged conduct of Vasil Green was the type of conduct that a jury might conclude was "another's volitional act" or an "accidental" cause of the crash. This aspect of the causation statute was therefore a "material point," where the failure to have provided the jury with controlling legal instructions constitutes reversible error. State v. Grunow, supra, 102 N.J. at 148, 506 A.2d 708.
We conclude that the failure to have instructed the jury that the State was required to prove that the deaths of Eldridge's passengers were not the result of "another's volitional conduct" or "accidental," pursuant to N.J.S.A. 2C:2-3(c), had the clear capacity to bring about an unjust result. Because that defect in the charge is sufficient to raise a reasonable doubt as to whether that omission led the jury to a result it might not otherwise have reached, the error was not harmless. See R. 2:10-2; State v. Macon, 57 N.J. 325, 338, 273 A.2d 1 (1971).
In light of our conclusion that the conviction must be reversed, we need not address Eldridge's excessive sentencing argument.
Reversed and remanded for a new trial.
NOTES
[1] The trial court in Martin instructed the jury that "causing the death or serious bodily injury must be within the design, it must be with the contemplation of the defendant." Martin, supra, 119 N.J. at 16, 573 A.2d 1359.
[2] Although the model jury charge was later amended, we refer herein to the version in effect at the time of trial.