78 A.3d 958

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. KEITH
R. BUCKLEY, DEFENDANT–RESPONDENT.

Argued November 5, 2012—Decided May 15, 2013.

250

252

*Joie D. Piderit*, Assistant Prosecutor, argued the cause for appellant (*Bruce J. Kaplan*, Middlesex County Prosecutor, attorney; *Ms. Piderit* and *Nancy A. Hulett*, Assistant Prosecutor, of counsel and on the briefs).

*Alan L. Zegas* argued the cause for respondent (*Mr. Zegas* and *Mandelbaum, Salsburg, Lazris & Discenza*, attorneys; *Mr. Zegas* and *Robert W. Gluck*, of counsel; *Mr. Gluck* and *Frank M. Gennaro*, on the briefs).

*Carol M. Henderson*, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Jeffrey S. Chiesa*, Attorney General, attorney).

Justice PATTERSON delivered the opinion of the Court.

On August 12, 2008, a Dodge Viper sports car carrying two North Brunswick police lieutenants drove off Route 130 and collided with a utility pole. The passenger, Christopher Zerby, died shortly after the accident. The driver, defendant Keith R. Buckley, survived the impact with no serious injuries. He was indicted for second-degree vehicular homicide, *N.J.S.A.* 2C:11–5.

This case concerns the evidence that will be admissible at defendant's trial on the issue of causation. The State will bear the burden of proving beyond a reasonable doubt that defendant caused Zerby's death by driving recklessly. *See N.J.S.A.* 2C:1–13(a), :11–5(a); *State v. Delibero*, 149 *N.J.* 90, 99, 692 *A.2d* 981 (1997). The statute initially requires the jury to determine whether there is "but for" causation. *N.J.S.A.* 2C:2–3(a)(1). If that threshold determination is made, and the offense requires the mens rea of recklessness, the causation inquiry is governed by the two-pronged standard of *N.J.S.A.* 2C:2–3(c). Under the first prong of that test, the statute predicates a finding of causation upon proof that "the actual result" was "within the risk of which the actor is aware." *N.J.S.A.* 2C:2–3(c). Alternatively, causation may be proven under the second component of the statutory test: whether "the actual result" involves the "same kind of injury or

harm as the probable result," and whether it is "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense." *Ibid.* In this case, however, the State represents that it will rely exclusively on the first prong of *N.J.S.A.* 2C:2–3 (c).

Before the trial court, the State moved in limine to exclude two categories of evidence from the jury's consideration: evidence that the victim, Zerby, was not wearing a seat belt when he was killed in the accident, and evidence that the utility pole struck by defendant's vehicle was positioned in a location that contravened recommendations set forth in the New Jersey Department of Transportation (DOT) Roadway Design Manual. The trial court denied the State's motion, concluding that both categories of evidence may be admissible as relevant to the jury's determination of the issue of causation. The Appellate Division granted the State's motion for leave to appeal and affirmed. We granted the State's motion for leave to appeal.

We reverse the Appellate Division's determination. We hold that fact and expert testimony about the victim's failure to wear a seat belt is irrelevant to both "but for" causation under *N.J.S.A.* 2C:2–3(a)(1) and the jury's causation determination under the first prong of *N.J.S.A.* 2C:2–3(c)'s statutory test—whether defendant was aware that the manner in which he drove posed a risk of a fatal accident. To ensure the jury's complete understanding of the circumstances of the accident, the trial court may admit evidence that Zerby's seat belt was not fastened when he was found in the vehicle's passenger seat after the accident. If the trial court admits such evidence, it must give the jury an appropriate limiting instruction. We further conclude that the position of a utility pole, off the roadway on an asphalt berm, is similarly irrelevant to the "but for" causation inquiry under *N.J.S.A.* 2C:2–3(a)(1) and to defendant's awareness of the risk of his conduct under the first prong of *N.J.S.A.* 2C:2–3(c).

## I.

In August 2008, defendant was a veteran police officer. He had served in the North Brunswick Police Department for fourteen years, and held the rank of lieutenant, supervising officers assigned to patrol responsibilities.[1]

Defendant and Zerby, who also held the rank of lieutenant in the Department, were on duty on the day of the accident. At 10:00 a.m., defendant called his brother, who lived in North Brunswick. Defendant's brother had rented a high-performance sports car from a local rental company. The rental agreement barred anyone other than defendant's brother from driving the vehicle and required him to return it by 9:00 p.m. that evening. The car was a gray 2006 Dodge Viper convertible, capable of accelerating from 0 to 60 miles per hour in approximately 4.2 seconds, and from 0 to 100 miles per hour in 9.4 seconds. Defendant and his brother arranged to meet at the latter's home at 10:30 a.m. Defendant arrived at the home in an unmarked patrol vehicle. Notwithstanding the restriction in the rental agreement, defendant's brother permitted defendant to drive the Dodge Viper on the condition that he return the vehicle by 12:30 p.m.

Defendant left his brother's home driving the rental car. Minutes later, he saw Zerby and another officer near an elementary school. Defendant pulled up next to Zerby and asked him if he wanted an "early lunch," and Zerby said that he wanted a ride in the sports car. By agreement, the two met ten minutes later, at approximately 10:55 a.m., at police headquarters. Zerby was seen leaving his patrol car at the headquarters and entering the Dodge Viper driven by defendant. The two drove off. It is undisputed that defendant continued to drive the car and that Zerby sat in the

---

[1] The factual record before the Court consists almost entirely of grand jury testimony. The testimony is not sealed. The parties and amicus curiae rely upon it, as did the trial court and Appellate Division panel, and it is summarized here.

passenger seat. Two witnesses stated the top of the convertible was down.

Defendant and Zerby left police headquarters, proceeded down Georges Road, navigated an overpass across Route 1, drove on to Route 130 South and stopped at a red light at the intersection of Route 130 and Carolier Lane in North Brunswick. Shortly after the light at the intersection turned green, the Dodge Viper traversed the intersection and continued southward on Route 130. The weather was clear, the road was dry and no construction was taking place in the area. The speed limit on the relevant section of the road was 45 miles per hour.

The accident occurred at approximately 11:06 a.m., just past a shopping center and a corporate office facility on Route 130 South. Just north of the section of the highway where the accident occurred, there were multiple lane mergers and a curve in the road. Witnesses reported observing the vehicle shortly before the accident, and the collision was partially recorded by a DOT camera.[2] Defendant drove off Route 130 and collided with a utility pole. Following impact, the Dodge Viper came to rest on the asphalt berm adjacent to the road, facing in a nearly north-ward direction. A guardrail was severely damaged and partially uprooted. The utility pole that had been installed in the berm was displaced approximately five inches, and a portion of the pole was embedded in the rear of the car. The vehicle sustained severe damage, with the right front and right rear wheels dislodged.

Defendant emerged from the driver's side and was able to walk without assistance following the crash. Zerby was unresponsive when emergency aid arrived on the scene. He was transported by ambulance to Robert Wood Johnson Medical Center in New Brunswick and pronounced dead at 11:44 a.m. An autopsy was

---

[2] The parties dispute the precise series of events preceding the accident, particularly the Dodge Viper's rate of acceleration after the light turned green, the vehicle's speed at the time of the accident and the driver's actions immediately before impact. Those issues were not the subject of any factual finding by the trial court on the motion, and are not before this Court.

conducted, and the cause of Zerby's death was determined to be multiple blunt force injuries to the head and chest due to a motor vehicle collision.

## II.

Defendant was issued motor vehicle summonses under *N.J.S.A.* 39:4–98 (speeding) and *N.J.S.A.* 39:4–96 (reckless driving). On October 31, 2008, defendant was indicted for second-degree vehicular homicide, *N.J.S.A.* 2C:11–5. On July 7, 2009, he was separately indicted for two counts of second-degree official misconduct, *N.J.S.A.* 2C:30–2(a) and (b). The second indictment was the subject of separate proceedings and is not before this Court. *See State v. Buckley,* No. A–3922–09, 2011 *WL* 3503158 (App.Div. Aug. 11, 2011), *certif. denied,* 210 *N.J.* 108, 40 *A.*3d 732 (2012).

Following his indictment, defendant proffered fact and expert evidence that Zerby was not wearing a seat belt at the time of the accident, and would have survived the accident had he worn a seat belt. Defendant also proposed to introduce evidence that the utility pole with which he collided was located in front of the guardrail, rather than behind it as required by the DOT Roadway Design Manual.

The State filed a motion in limine and for other relief before the trial court. It sought to bar defendant from arguing a defense of remote causation, predicated on Zerby's failure to wear a seat belt. It also requested an order precluding defendant from introducing evidence that Zerby would have survived the accident had he been wearing a seat belt, that the location of the utility pole violated the DOT Roadway Design Manual and that Zerby would have survived the accident had the utility pole been located in accordance with the DOT Roadway Design Manual's guidelines. The State also requested a limiting charge instructing the jury that Zerby's failure to wear a seat belt did not give rise to a defense to the charge of vehicular homicide, and that the jury should not consider for any purpose whether Zerby was wearing a seat belt when he was killed.

The trial court denied the State's motion. It determined the jury could consider Zerby's failure to wear a seat belt as an intervening act within the meaning of *N.J.S.A.* 2C:2–3(c). Relying on the dissent in *State v. Pelham*, 176 *N.J.* 448, 470, 824 *A.*2d 1082 (Albin, J., dissenting), *cert. denied*, 540 *U.S.* 909, 124 *S.Ct.* 284, 157 *L.Ed.*2d 198 (2003), the trial court deemed that it would be inappropriate to limit the jury's determination of an intervening act for purposes of *N.J.S.A.* 2C:2–3(c). The trial court expressed its discomfort with permitting the jury to consider the placement of the utility pole as an intervening factor in the causation inquiry. Nevertheless, it denied the motion in limine as to that evidence as well, and indicated that the judge assigned to conduct the trial should hold a hearing pursuant to *N.J.R.E.* 104 to determine the admissibility of both categories of evidence.

The State moved for leave to appeal, and an Appellate Division panel affirmed. Distinguishing *Pelham*, based upon the sequence of the series of events at issue in this case, the panel concluded that the jury could consider the victim's failure to wear a seat belt and the placement of the utility pole as potential intervening causes of the accident.

We granted the State's motion for leave to appeal. 209 *N.J.* 99, 35 *A.*3d 681 (2012).

### III.

The State argues that defendant's proffered evidence of Zerby's decision not to fasten his seat belt and the location of the utility pole constitutes an attempt to encourage jury nullification. It contends that the Appellate Division panel erred in its conclusion that Zerby's failure to wear a seat belt could be an intervening cause of his death and improperly introduced the concept of contributory negligence, rooted in civil law, into the issue of causation under the Code of Criminal Justice. The State argues that Zerby's failure to wear a seat belt cannot be construed to be a cause of defendant's loss of control of the Dodge Viper or of the collision, and that it cannot, as a matter of law, be considered an

intervening cause under *N.J.S.A.* 2C:2–3(c). Although the State addressed both components of *N.J.S.A.* 2C:2–3(c)'s causation standard in its brief, it represented at oral argument that it intends to rely upon the first prong of the statutory test, under which "the actual result must be within the risk of which [defendant was] aware." *N.J.S.A.* 2C:2–3(c). The State's position is that the first component of the statutory test is satisfied and that the second prong is not applicable in the setting of this vehicular homicide case.

Defendant counters that his proffered evidence is not intended to encourage jury nullification. He argues that the "bright line" rule urged by the State—which would exclude evidence of seat belt use on the issue of intervening causation—should be rejected because such a rule would be impractical. Defendant urges the Court to permit the jury to consider the evidence regarding Zerby's failure to wear a seat belt and the improper location of the utility pole.

Amicus curiae Attorney General of New Jersey contends that a victim's decision not to wear a seat belt cannot break the chain of causation that commenced with defendant's driving, at what amicus characterizes to be excessive speed, because it occurred prior to defendant's driving conduct. It argues that the defendant's seat belt evidence supports nothing more than a conclusion that Zerby was not saved from the consequences of defendant's reckless conduct by a safety device, and that the victim's failure to use this device cannot constitute an intervening act.

IV.

A trial court's ruling on the admissibility of evidence is "subject to limited appellate scrutiny." *State v. Buda,* 195 *N.J.* 278, 294, 949 *A.*2d 761 (2008). We afford considerable deference to a trial court's findings based on the testimony of witnesses. *State v. Elders,* 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007). A trial court's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special defer-

ence." *State v. Handy,* 206 *N.J.* 39, 45, 18 *A.*3d 179 (2011); *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). To the extent that the trial court's ruling constituted an interpretation of *N.J.S.A.* 2C:2–3(c), we review it de novo. *State v. Mann,* 203 *N.J.* 328, 337, 2 *A.*3d 379 (2010).

▮▮▮▮ The application under review consisted in part of a motion in limine, governed by *N.J.R.E.* 401's definition of relevancy. Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. Relevancy consists of probative value and materiality. *State v. Hutchins,* 241 *N.J.Super.* 353, 359, 575 *A.*2d 35 (App.Div.1990). Probative value "is the tendency of the evidence to establish the proposition that it is offered to prove." *State v. Wilson,* 135 *N.J.* 4, 13, 637 *A.*2d 1237 (1994). "A material fact is one which is really in issue in the case." *Hutchins, supra,* 241 *N.J.Super.* at 359, 575 *A.*2d 35. Thus, "our inquiry focuses on 'the logical connection between the proffered evidence and a fact in issue.'" *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 15, 860 *A.*2d 435 (2004) (quoting *Hutchins, supra,* 241 *N.J.Super.* at 358, 575 *A.*2d 35). Evidence need not be dispositive or even strongly probative in order to clear the relevancy bar. *See State v. Coruzzi,* 189 *N.J.Super.* 273, 302, 460 *A.*2d 120 (App.Div.), *certif. denied,* 94 *N.J.* 531, 468 *A.*2d 185 (1983). It "need only have some tendency to prove a material fact." *Ibid.* The inquiry is "whether the thing sought to be established is more logical with the evidence than without it." *Ibid.*[3]

---

[3] Relevant evidence may be excluded under one of several rules of evidence, including *N.J.R.E.* 403, which excludes relevant evidence "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." In this case, no evidentiary issue other than the relevance of the contested evidence to the issue of causation is raised by the parties.

## V.

The relevancy determination requires that we consider the statutory elements that the State must prove. The offense at issue in this case, vehicular homicide, is codified at *N.J.S.A.* 2C:11–5. The statute provides that "[c]riminal homicide constitutes vehicular homicide when it is caused by driving a vehicle or vessel recklessly," which in this case is a crime of the second degree. *N.J.S.A.* 2C:11–5(a), (b). The State has the burden of proving beyond a reasonable doubt three elements: (1) that "defendant was driving a vehicle"; (2) that "defendant caused the death"; and (3) that the death was caused by driving a vehicle recklessly. *State v. Eldridge*, 388 *N.J.Super.* 485, 494, 909 *A.*2d 736 (App.Div.2006), *certif. denied,* 189 *N.J.* 650, 917 *A.*2d 789 (2007). Because the first of these three elements—that defendant was driving at the time of the collision—is undisputed, our focus is on the State's obligation to prove, beyond a reasonable doubt, defendant's recklessness and causation.

The mental state of recklessness, which the State must prove to support a conviction under *N.J.S.A.* 2C:11–5, is defined in *N.J.S.A.* 2C:2–2(b)(3). *See* Cannel, *New Jersey Criminal Code Annotated,* comment 2 on *N.J.S.A.* 2C:11–5 (2012). *N.J.S.A.* 2C:2–2(b)(3) provides:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

As explained by the drafters of the Code, recklessness "involves conscious risk creation," and requires "that the risk thus consciously disregarded by the actor be substantial and unjustifiable." II *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission,* commentary to § 2C:2–2, at 41–42 (1971) [hereinafter *Final Report* ]. A driver need not be intoxicated or under the influence of drugs to drive recklessly; a finding of recklessness can be premised upon excessive speed,

among other factors. *State v. Stanton,* 176 *N.J.* 75, 85, 820 *A.*2d 637, *cert. denied,* 540 *U.S.* 903, 124 *S.Ct.* 259, 157 *L.Ed.*2d 187 (2003); Cannel, *supra,* comment 4 on *N.J.S.A.* 2C:2–2.

We construe the language of *N.J.S.A.* 2C:2–3(c)'s causation standard in accordance with established principles of statutory construction. "When interpreting statutory language, the goal is to divine and effectuate the Legislature's intent." *State v. Shelley,* 205 *N.J.* 320, 323, 15 *A.*3d 818 (2011). To determine the Legislature's intent, a court begins with the "language of the statute, giving the terms used therein their ordinary and accepted meaning." *Ibid.* "When the Legislature's chosen words lead to one clear and unambiguous result, the interpretative process comes to a close, without the need to consider extrinsic aids." *Ibid.*

Under *N.J.S.A.* 2C:2–3, the issue of causation is determined by a multi-step analysis:

a. Conduct is the cause of a result when:

(1) It is an antecedent but for which the result in question would not have occurred; and

(2) The relationship between the conduct and result satisfies any additional causal requirements imposed by the code or by the law defining the offense.

. . . .

c. When the offense requires that the defendant recklessly . . . cause a particular result, the actual result must be within the risk of which the actor is aware or, . . . if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

[*N.J.S.A.* 2C:2–3.]

While "[c]ausation is a factual determination for the jury to consider . . . the jury may consider only that which the law permits it to consider." *Pelham, supra,* 176 *N.J.* at 466, 824 *A.*2d 1082. Thus, the jury initially determines whether the State has established "but for" causation by demonstrating that the event would not have occurred absent the defendant's conduct. *N.J.S.A.* 2C:2–3(a). In cases involving the mens rea of recklessness, the jury then conducts a "culpability assessment" under *N.J.S.A.*

2C:2–3(c). *Pelham, supra,* 176 *N.J.* at 460, 824 *A.*2d 1082 (citing *State v. Martin,* 119 *N.J.* 2, 11–13, 573 *A.*2d 1359 (1990)). As the drafters of the Code noted, *N.J.S.A.* 2C:2–3(c) "deal[s] explicitly with variations between the actual result" and the result risked in a recklessness case, and "stat[es] when the variation is not material." *Final Report, supra,* commentary to § 2C:2–3, at 50.

The "actual result," as the term is used in *N.J.S.A.* 2C:2–3(c), denotes the harm inflicted on the victim. Specifically in a case in which the State alleges that the defendant's reckless conduct caused a fatality, the "actual result" is the victim's death in the accident. The Code's drafters limited *N.J.S.A.* 2C:2–3 to "offenses which are so defined that causing a particular result is a material element of the offense." *Id.* at 49. Thus, when the defendant is charged with a violation of *N.J.S.A.* 2C:11–5, the result that is a material element of the offense is the death of another person. *See N.J.S.A.* 2C:11–5; *see also Pelham, supra,* 176 *N.J.* at 460, 467, 824 *A.*2d 1082 (implying victim's death was "actual result" for purposes of *N.J.S.A.* 2C:2–3(c)); *State v. Jamerson,* 153 *N.J.* 318, 335–36, 708 *A.*2d 1183 (1998) (indicating victim's death was "actual result" in vehicular homicide case); *Martin, supra,* 119 *N.J.* at 11–12, 573 *A.*2d 1359 (inferring in murder case in which defendant was accused of setting fatal fire, death of victim was "actual result" under *N.J.S.A.* 2C:2–3(c)).

Thus, in this vehicular homicide case, the first prong of *N.J.S.A.* 2C:2–3(c) requires the jury to assess whether the defendant was aware that his allegedly reckless driving gave rise to a risk of a fatal motor vehicle accident. If the jury determines that the State has proven beyond a reasonable doubt that the defendant understood that the manner in which he or she drove created a risk of a traffic fatality, the element of causation is established under the first prong of *N.J.S.A.* 2C:2–3(c). *See Martin, supra,* 119 *N.J.* at 12, 573 *A.*2d 1359.

The second prong of *N.J.S.A.* 2C:2–3(c), on which the State does not rely here, requires proof that the actual result—in this case the victim's death—"involve[s] the same kind of injury or

harm as the probable result" of the defendant's conduct. Under the second component of the test, when permitted by the law, " 'it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result.' " *Pelham, supra,* 176 *N.J.* at 461, 824 *A.*2d 1082 (quoting *Martin, supra,* 119 *N.J.* at 13, 573 *A.*2d 1359). The Code "does not identify what may be an intervening cause," *ibid.,* but " 'deals only with the ultimate criterion by which the significance of such possibilities ought to be judged,' " *Martin, supra,* 119 *N.J.* at 13, 573 *A.*2d 1359 (quoting *Final Report, supra,* commentary to § 2C:2–3, at 50). An " 'intervening cause' " occurs when an event " 'comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury.' " *Pelham, supra,* 176 *N.J.* at 461, 824 *A.*2d 1082 (quoting *Black's Law Dictionary* 212 (7th ed. 1999)). "Generally, to avoid breaking the chain of causation for criminal liability, a variation between the result intended or risked and the actual result of [the] defendant's conduct must not be so out of the ordinary that it is unfair to hold [the] defendant responsible for that result." *Id.* at 461–62, 824 *A.*2d 1082 (citing *Martin, supra,* 119 *N.J.* at 14, 573 *A.*2d 1359; Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 35, at 246 (1972)). Thus, an "intervening cause" denotes an event or condition which renders a result "too remote, accidental in its occurrence, or dependent on another's volitional act" to fairly affect criminal liability or the gravity of the offense. *See N.J.S.A.* 2C:2–3(c); *Pelham, supra,* 176 *N.J.* at 461–62, 824 *A.*2d 1082.

The prior jurisprudence of this Court and the Appellate Division addressing *N.J.S.A.* 2C:2–3(c) has focused on the second prong of the statutory test. *See Pelham, supra,* 176 *N.J.* at 450–52, 824 *A.*2d 1082 (reversing Appellate Division's determination that catastrophically injured accident victim's decision to terminate ventilator treatment constituted intervening act for purposes of second prong of *N.J.S.A.* 2C:2–3(c)); *Jamerson, supra,* 153 *N.J.* at 335–36, 708 *A.*2d 1183 (concluding victim's alleged disregard of stop

sign was relevant to "but for" causation under *N.J.S.A.* 2C:2–3(a) and both prongs of *N.J.S.A.* 2C:2–3(c), because that driving error, rather than defendant's impaired driving, could have caused fatal accident); *Martin, supra,* 119 *N.J.* at 9–10, 16–17, 573 *A.*2d 1359 (agreeing that presence of flammable carpeting, open apartment doors, and kerosene in apartment in which victim was present, along with victim's intoxication, were relevant to determine whether victim's death was too remote under second prong of *N.J.S.A.* 2C:2–3(c)); *Eldridge, supra,* 388 *N.J.Super.* at 487–88, 491–92, 909 *A.*2d 736 (holding jury should have been instructed that they could consider passenger's behavior of tickling defendant and turning her face sideways as potential "intervening cause" under *N.J.S.A.* 2C:2–3(c)); *State v. Radziwil,* 235 *N.J.Super.* 557, 570, 563 *A.*2d 856 (App.Div.1989), *aff'd o.b.,* 121 *N.J.* 527, 528, 582 *A.*2d 1003 (1990) (noting that "[i]f the careless driving of another driver or the victim's failure to wear a seat belt also were contributing causes of the accident and resulting fatality, this would not absolve defendant of responsibility").

Because the State relies exclusively on the first prong of *N.J.S.A.* 2C:2–3(c), we do not consider the potential import of defendant's arguments with regard to the statute's second prong. Based on the State's representations, the second prong is not part of the pending prosecution, and the State may not rely on it as a basis to convict defendant.

## VI.

 Defendant claims that Zerby declined to wear a seat belt, as required by law.[4] He does not contend that the accident would have been avoided had Zerby worn a seat belt when he rode in the passenger seat of the Dodge Viper driven by defendant. Instead, defendant seeks to introduce fact and expert testimony that Zerby would have survived the accident had he worn a seat belt at the

---

[4] *See N.J.S.A.* 39:3–76.2f (requiring driver and all front-seat passengers to "wear a properly adjusted and fastened safety seat belt system").

moment of impact, and to argue to the jury that, accordingly, the State cannot meet its burden of proof on the issue of causation.

As we noted in *Pelham*, "the jury may consider only that which the law permits it to consider." *Pelham*, *supra*, 176 *N.J.* at 466, 824 *A.*2d 1082. To be admissible on the issue of causation, the evidence at issue must be relevant to the jury's inquiry under the first prong of *N.J.S.A.* 2C:2–3(c). The determinations that the jury will be called upon to make on the issue of causation are thus central to our inquiry.

The first of these determinations is whether the defendant's conduct is "an antecedent but for which the result in question would not have occurred." *N.J.S.A.* 2C:2–3(a)(1). The "but for" test is a simple one. If the State proves beyond a reasonable doubt the "result" would not have occurred without the "conduct," it has met its burden on this threshold issue. *Martin*, *supra*, 119 *N.J.* at 11–12, 573 *A.*2d 1359. Here, the "result" is Zerby's death in the motor vehicle accident. Defendant's "conduct" is the manner in which he drove the vehicle—alleged by the State to have been reckless, a contention vigorously disputed by defendant. The "but for" test of *N.J.S.A.* 2C:2–3(a) focuses the jury entirely upon the role of the defendant's conduct—the manner in which he drove before and during the collision. The State must demonstrate nothing more than that the fatal accident would have been avoided had defendant not driven the Dodge Viper in the manner in which he did. Defendant's proffered fact and expert evidence on the seat belt issue therefore is irrelevant to the threshold "but for" causation inquiry.

We next consider whether evidence regarding Zerby's failure to wear a seat belt is relevant to the first component of *N.J.S.A.* 2C:2–3(c)'s two-pronged test for causation: whether "the actual result" was "within the risk of which the actor is aware." Under this portion of the statutory test, the jury will determine whether defendant was aware that, by virtue of the manner in which he drove the vehicle, he created a risk of a fatal collision. *See Pelham*, *supra*, 176 *N.J.* at 467, 824 *A.*2d 1082; *Martin*,

*supra,* 119 *N.J.* at 12, 573 *A.*2d 1359; *see also State v. Campfield,* 213 *N.J.* 218, 233–34, 61 *A.*3d 1258 (2013) (whether risk of death was contemplated for reckless manslaughter). If the jury determines that defendant was aware that his conduct gave rise to such a risk, it need not assess the exact degree of that risk, or the variables that could affect its magnitude. Fact and expert evidence that Zerby's failure to wear a seat belt exacerbated his chance of dying in the collision is thus irrelevant to the jury's inquiry on the first prong of *N.J.S.A.* 2C:2–3(c).

Our holding does not require the trial court to bar all evidence that Zerby failed to use a seat belt. The trial court may exercise its discretion to permit the admission of testimonial or documentary evidence regarding the condition in which Zerby was found following the collision, including evidence that his seat belt was observed to be unbuckled. The admission of such evidence may be necessary for the jury to gain a thorough understanding of the findings of the investigating officers and the circumstances of the accident. *Cf. State v. Rose,* 206 *N.J.* 141, 181, 19 *A.*3d 985 (2011) (concluding " 'necessary background' " evidence can be admitted for a limited "non-propensity purpose" pursuant to *N.J.R.E.* 404(b) " 'to avoid confusing the jury' " (citing *United States v. Green,* 617 *F.*3d 233, 249 (3d Cir.), *cert. denied,* —— *U.S.* ——, 131 *S.Ct.* 363, 178 *L.Ed.*2d 234 (2010)).

If such evidence is admitted, the trial court must instruct the jury that Zerby's failure to use a seat belt is not relevant to "but for" causation, *N.J.S.A.* 2C:2–3(a), or the first prong of *N.J.S.A.* 2C:2–3(c). As in *Pelham,* the trial court should be careful not to state or imply that it is directing a verdict on the issue of causation. *See Pelham, supra,* 176 *N.J.* at 467, 824 *A.*2d 1082. That issue is for the jury to determine.

## VI.

We also review the Appellate Division panel's decision affirming the trial court's denial of the State's motion in limine on a second category of evidence: defendant's proposed evidence

regarding the location of the utility pole. The panel reasoned that the utility pole may have been positioned in a manner inconsistent with the DOT Roadway Design Manual, and thereby contravened *N.J.S.A.* 48:17–11, which provides that "poles, wires, conduits and other fixtures ... shall be so placed as not to interfere with the safety or convenience of persons or vehicles traveling on any such street, road or highway." [5]

We do not concur with the Appellate Division panel's ruling. We hold that fact and expert testimony regarding the claimed discrepancy between the utility pole placement and the guidelines in the DOT Roadway Design Manual is inadmissible on the issue of causation under *N.J.S.A.* 2C:2–3(c). First, the claimed discrepancy between the recommended location of a specific utility pole and its actual location is irrelevant to the threshold decision that the jury will make—whether defendant's driving was "an antecedent but for which" the accident would not have occurred. *N.J.S.A.*

---

[5] The record before the Court does not contain the DOT Roadway Design Manual that was at issue before the trial court, identify the date of that document, specify what provisions of that manual defendant contends would be relevant to the utility pole at issue in this case or identify the person or entity responsible for the placement of the utility pole. We note that DOT currently publishes a Roadway Design Manual. That document provides in part that "[i]n no case, shall utility poles on new or upgraded guide rail installations remain in front of guide rail[,]" and that "[d]esirably on projects where new right-of-way is to be purchased, sufficient right-of-way should be acquired to permit the placement of the poles beyond the clear zone." *Roadway Design Manual*, State of New Jersey Department of Transportation, § 8.2.4(B)(2) (Oct. 13, 2010), http://www.state.nj.us/transportation/eng/documents/RDM/zip/RDM20120223b.zip.

"On existing highways," however, the Roadway Design Manual permits a "crash analysis" to be performed to determine if "utility pole relocation ... should be considered instead of guide rail" because "[i]t is questionable whether a safer roadside would result from installing guide rail for the sole purpose of shielding utility poles within the clear zone." *Ibid.* The guidelines contained in Section 8 of the Roadway Design Manual "are primarily informational or guidance in character and serve to assist the engineer in attaining good design. Deviations from this information or guidance do not require a design exception." *Id.* § 1.1 (May 9, 2008). Thus, contrary to the Appellate Division panel's suggestion, there is no indication in the record before the Court that the Roadway Design Manual imposed any mandatory requirement applicable to the utility pole at issue here.

2C:2–3(a)(1). Second, under the first prong of *N.J.S.A.* 2C:2–3(c), the jury's determination of whether a fatal accident was "within the risk of which [defendant was] aware" does not, as a matter of law, implicate a particular utility pole's compliance with DOT recommendations. The question of defendant's awareness that his driving posed a risk of a fatal accident bears no nexus to the precise placement of a single utility pole, one among many structures and other stationary objects located near the road on which he drove on the day of the accident.

Accordingly, the trial court should have granted the State's motion in limine to exclude evidence of the allegedly improper placement of the utility pole. We reverse the Appellate Division's determination affirming the trial court's denial of the State's motion with respect to that issue.

## VII.

The Appellate Division's judgment is reversed, and the matter is remanded for proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice RABNER, Justice LaVECCHIA, Justice HOENS, Justice PATTERSON, Judge RODRÍGUEZ (t/a), Judge CUFF (t/a)—6.