**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2758-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DWAYNE S. JOHNSON,

    Defendant-Appellant.

_____

Submitted October 19, 2016 — Decided May 30, 2017

Before Judges Fuentes, Simonelli and Carroll.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 13-07-1643.

Joseph E. Krakora, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).

Carolyn A. Murray, Acting Essex County Prosecutor, attorney for respondent (Camila Garces, Special Deputy Attorney General/ Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A grand jury indicted defendant Dwayne S. Johnson for first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); first-degree robbery, N.J.S.A. 2C:15-1 (count two); and first-degree murder during the commission of a crime, N.J.S.A. 2C:11-3(a)(3) (count three). The charges stemmed from the beating death of Terrance Everett, which an eyewitness captured on cell phone video.

Following the denial of his motion to dismiss the indictment, defendant was tried by a jury and found guilty on count one, guilty on count two of third-degree theft from a person, N.J.S.A. 2C:20-2(b)(2)(d), amended from first-degree robbery, and not guilty on count three. The trial judge sentenced defendant on count one to a fifty-year term of imprisonment with an eighty-five-percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and to a consecutive four-year term of imprisonment on count two.

On appeal, defendant raises the following contentions:

> POINT I    THE TRIAL COURT'S RULING ADMITTING THE CELL PHONE VIDEO INTO EVIDENCE WAS HARMFUL ERROR BECAUSE UNDER N.J.R.E. 402 THE VIDEO WAS NOT RELEVANT TO THE MATERIAL ISSUE OF CAUSE OF DEATH, AND BECAUSE UNDER N.J.R.E. 403 THE VIDEO SHOULD HAVE BEEN EXCLUDED SINCE THE [] CUMULATIVE EMOTIONAL IMPACT ON THE JURY RESULTING FROM ITS REPEATED PLAYING DURING THE TRIAL CAUSED UNDUE PREJUDICE.

POINT II        DEFENDANT'S MOTION FOR A JUDGMENT
                OF ACQUITTAL SHOULD HAVE BEEN
                GRANTED BECAUSE DR. CRONIN FAILED
                TO COUCH [HER] OPINION AS TO CAUSE
                OF DEATH "WITHIN A REASONABLE
                DEGREE OF MEDICAL CERTAINTY."

POINT III       DEFENDANT'S MOTION TO DISMISS THE
                INDICTMENT SHOULD HAVE BEEN
                GRANTED BECAUSE THE PROSECUTOR'S
                FAILURE TO PRESENT EXCULPATORY
                EVIDENCE TO THE GRAND JURY
                AMOUNTED TO TELLING THE GRAND JURY
                A "HALF TRUTH."

POINT IV        THE TRIAL COURT'S JURY INSTRUCTION
                ON CIRCUMSTANTIAL EVIDENCE
                PREJUDICED THE DEFENDANT (NOT
                RAISED BELOW).

POINT V         THE [FIFTY-FOUR-YEAR] AGGREGATE
                BASE CUSTODIAL SENTENCE WAS
                MANIFESTLY EXCESSIVE AND
                REPRESENTS A MISAPPLICATION OF
                JUDICIAL SENTENCING DISCRETION.

                        (A)
                THE TRIAL COURT MISAPPLIED ITS
                DISCRETION IN FINDING THAT
                AGGRAVATING FACTOR N.J.S.A.
                2C:44-1[(a)](2) WAS APPLICABLE.

                        (B)
                THE TRIAL COURT MISAPPLIED ITS
                DISCRETION IN IMPOSING
                CONSECUTIVE SENTENCES ON COUNTS
                ONE AND TWO.

Defendant raises the following contentions in a pro se supplemental

brief:

        POINT I

                DEFENDANT'S MOTION TO DISMISS THE
                INDICTMENT SHOULD HAVE BEEN GRANTED

3

BECAUSE THE PROSECUTOR'S FAILURE TO PRESENT EXCULPATORY EVIDENCE TO THE GRAND JURY AMOUNTED TO TELLING THE GRAND JURY A "HALF TRUTH[.]"

POINT II

TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO [THE MEDICAL EXAMINER'S] TESTIMONY AS AN EXPERT WITNESS THUS VIOLATING DEFENDANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.

POINT III

THE TRIAL COURT [ERRED] IN PROVIDING IMPROPER JURY INSTRUCTIONS AND THEREFORE PREJUDICED THE DEFENDANT.

We decline to address defendant's contention in Point II of his pro se supplemental brief. "Our courts have expressed a general policy against entertaining ineffective-assistance of counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Castagna, 187 N.J. 293, 313 (2006) (quoting State v. Preciose, 129 N.J. 451, 460 (1992)). "However, when the trial itself provides an adequately developed record upon which to evaluate defendant's claims, appellate courts may consider the issue on direct appeal." Ibid. (citing State v. Allah, 170 N.J. 269, 285 (2002)). We are not persuaded that the record is sufficiently developed to permit us to consider defendant's claim of ineffective assistance of counsel on appeal. Thus, we adhere to the practice of deferring the issues of alleged ineffective assistance of

4

counsel to post-conviction relief proceedings where the necessary factual record can be established, and focus on the remaining contentions.

I.

We derive the following facts from the record. At trial, D.B.[1] testified that at approximately 1:20 p.m. on January 7, 2013, she and A.M. were sitting in A.M.'s car, which was parked near an apartment building on Avon Avenue in Newark. She saw a man, later identified as Everett, walking in the area. She also saw defendant, who she knew, exit the building, drop his jacket, and run up to Everett and strike him. The two men began fighting, Everett fell to the ground, and defendant began hitting and kicking him. At that point, A.M. began recording the fight on his cell phone. D.B. viewed the cell phone video during her testimony and confirmed that it showed what she had witnessed. She also viewed a security camera video and confirmed it showed Everett walking in the area before the fight.

The seventy-three second cell phone video showed defendant repeatedly kicking and stomping Everett in the head as Everett lay face down and motionless on the ground. Defendant then paused briefly, rifled through Everett's pockets, resumed kicking and

---

[1] We use initials to protect the identities of the witnesses in this case.

stomping him in the head, and then walked away and entered the apartment building he had earlier exited.

D.B. testified that at no time did she see Everett grab his chest and fall over as if he was having a heart attack. However, the defense theory was that Everett died as a result of cardiac arrest caused by acute Phencyclidine (PCP) intoxication, and the video merely showed defendant kicking a dead body.

A.M. testified that he saw Everett walk past his car and then saw defendant run from the apartment building, go up to Everett, punch him, and the two men began fighting. Defendant got Everett on the ground and began kicking and stomping him in the head. At this point, A.M. began recording the fight on his cell phone. He viewed the cell phone video during his testimony and confirmed it showed what he had witnessed.

E.K. testified that he was driving in the area and he saw defendant and Everett standing and fighting in the middle of the street. Defendant was throwing punches at Everett and was winning the fight, while Everett had his hands up trying to block defendant's punches. After driving past the two men, E.K. looked in his rearview mirror, saw that Everett was on the ground, and saw defendant stomping Everett in the head "like he was trying to kill him." He viewed part of the cell phone video during his

testimony that showed the vehicle he was driving and confirmed it was his vehicle.

S.E. testified that she was driving in the area and saw defendant standing over Everett "in a rage" as Everett lay in the street. She exited her vehicle, went over to Everett, saw that he was breathing and his chest was raising up and down, and saw blood "gushing all over the ground." She walked back to her car and called the police and an ambulance. She saw defendant enter and then exit the apartment building with a white towel on his head, and then walk down the street. She viewed part of the video during her testimony that showed the vehicle she was driving and confirmed it was her vehicle.

S.E. testified that when Police Officer Jimmy Rios from the Newark Police Department arrived, she told him what she had witnessed, gave a description of defendant, and pointed in the direction where he had walked. Officer Rios testified that he proceeded in that direction and saw defendant walking down the street. He stopped defendant and saw that defendant was excited, aggressive, "a little bit agitated[,]" and sweating profusely. Defendant was carrying a white towel that appeared to have blood stains on it and he had some scrapes and abrasions on his knuckles. He placed defendant in his patrol vehicle and returned to the crime scene, where Everett had been pronounced dead at 1:41 p.m.

Detective Anthony Iemmello of the Essex County Prosecutor's Office Homicide Task Force testified that he arrived at the scene and saw Everett lying face down in the street. Everett's teeth were scattered on the ground, there was a large amount of blood coming from his nose, mouth, and head, his jacket was pulled up, and the flap on his right rear pocket had been lifted open as though someone went through the pocket. He also saw defendant and noticed that defendant had bruised knuckles and blood on his hand. He retrieved defendant's shirt and blood-stained black leather boots and jeans. Defendant stipulated that it was Everett's blood on the boots.

The State's expert in forensic pathology, Leanne Cronin, M.D., performed an autopsy on Everett. Dr. Cronin testified that Everett had blunt force trauma injuries to the head, such as abrasions and lacerations on his head; scleral hemorrhage in the whites of his eyes; hemorrhage of the surfaces under his eyelids; lacerations in his mouth; fractures of his nose and jaw; missing teeth; subgaleal hemorrhage under his scalp; and hemoaspiration of blood into the larynx and trachea extending to the main stem bronchi. Dr. Cronin found that Everett was breathing while he lay face down in the street, and explained that in order to get blood into the main stem bronchi there had to be a breath that pulled the blood down into the windpipe. Dr. Cronin also testified that

A-2758-14T3

the scleral hemorrhage in the white of Everett's eyes indicated he was alive at the time the blunt force trauma was administered, as this type of injury only occurs when a heart is beating. Dr. Cronin opined that blunt force trauma to Everett's head caused a fatal concussion that resulted in his death.

Dr. Cronin acknowledged that a toxicology report showed Everett had acute PCP intoxication at the time of his death, and that he was obese and had cardiovascular disease and an enlarged heart; however, she opined that none of these factors contributed to Everett's death. Dr. Cronin explained that the mechanisms of death from acute PCP intoxication and cardiovascular disease or a heart attack differ from the mechanism of blunt force trauma to the head causing a fatal concussion. Dr. Cronin reviewed the cell phone video during her testimony and testified that the type of kicking and stomping of Everett's head shown in the video would be the type of blunt force trauma to the head that caused the fatal concussion resulting in his death. Dr. Cronin also opined that the video showed Everett was alive and breathing during the recording.

Dr. Cronin acknowledged that Dr. Lauren Thoma noted in her neuropathology report there was nothing grossly wrong with Everett's brain. Dr. Cronin explained that this did not change her opinion as to cause of death

A-2758-14T3

[b]ecause fatal concussion is a diagnosis of exclusion, meaning I've excluded any grossly observable injuries that may cause death. So, [Dr. Thoma's] findings of a negative brain are consistent with a diagnosis of fatal concussion because, oftentimes, you don't see any gross evidence of a fatal concussion in the brain.

Dr. Thoma did not testify. Instead, the following stipulation was read to the jury:

Dr. Lauren [Thoma] would have testified that she is a neuropathologist, and she examined the brain of [Terrance] Everett on . . . March 20, 2013. She would have testified that she determined there were no pathological changes or trauma to the brain.

Dr. Thoma would also testify that this finding is uncommon when there's blunt force trauma to the head, which causes a fatal brain concussion. However, Dr. Thoma also would have testified that there are some cases where this has occurred.

Defendant's expert in forensic pathology and neuropathology, Zhongxue Hua, M.D., testified that he reviewed the cell phone video and could not conclude therefrom that Everett was alive during the recording. He reviewed the autopsy report, autopsy photographs, and toxicology and neuropathology reports, and concluded there was no convincing evidence that Everett was alive immediately before or during the beating or during the video recording, and no evidence that blunt force trauma to Everett's head caused a fatal concussion that resulted in his death. Dr. Hua also testified that other possible causes of Everett's death

10

were not evaluated, such as cardiac arrest caused by acute PCP intoxication. He noted that the combination of acute PCP intoxication and severe heart disease "can be lethal."

On cross-examination, Dr. Hua admitted that he never viewed the security camera video or the eyewitness' statements to the police, all of which confirmed that Everett was alive and walking before the fight. He also did not view photographs that showed Everett sustained nasal and facial fractures and hemorrhaging. He conceded that all of this evidence would have been relevant to his conclusions. He also conceded there was evidence of blunt force trauma to Everett's head and that the kicking of Everett's head shown in the video was blunt force trauma that could cause a fatal concussion.

## II.

Defendant filed a pre-trial motion to bar admission of the cell phone video, contending the video was not admissible under N.J.R.E. 402 because it was not relevant to the material issue of cause of death. He argued that the video did not tend to prove any material facts as to the two murder charges because there was no indication that Everett was alive during the recording. Defendant also argued the video was inadmissible under N.J.R.E. 403 because it was highly prejudicial.

In a written opinion, the trial judge reviewed the elements of murder under N.J.S.A. 2C:11-3(a)(1) and (2), and found the video was relevant and probative, as it tended to prove that defendant purposely or knowingly caused Everett's death or serious bodily injury resulting in death through blows to the head that led to a fatal concussion. The judge determined that in light of the experts' dispute as to the cause of Everett's death, the video was material because it showed defendant repeatedly kicking and stomping Everett in the head and was consistent with Dr. Cronin's conclusion that blunt force trauma to the head caused a fatal concussion resulting in Everett's death.

The judge found that the video's probative value was not substantially outweighed by the risk of undue prejudice. The judge noted that the video was only seventy-three seconds long and, although disturbing and upsetting, it was not extremely bloody or ghastly, or so inherently inflammatory as to detract the jurors from fairly considering whether defendant was guilty or innocent. The judge denied the motion, but ordered the State to mute the volume, which the State did.

On appeal, defendant reiterates in Point I that since there was no credible evidence that Everett was alive during the video recording, the video was not admissible under N.J.R.E. 402 because it was not relevant to the material issue of cause of death. In

12

the alternative, defendant reiterates that the video was inadmissible under N.J.R.E. 403 because it was prejudicial. Defendant adds that there was other non-inflammatory evidence available, and the cumulative effect of playing the video several times during the trial was unduly prejudicial, since the images of the assault were capable of engendering disgust and hatred towards him.

We review a trial court's evidentiary determinations for abuse of discretion. State v. Harris, 209 N.J. 431, 439 (2012). "A trial judge has broad discretion in making relevance and admissibility determinations under N.J.R.E. 401, 402, and 403, which we will not disturb, absent a manifest denial of justice." Lancos v. Silverman, 400 N.J. Super. 258, 275 (App. Div.), certif. denied, 196 N.J. 466 (2008). Applying these standards, we conclude that the judge properly admitted the cell phone video.

N.J.R.E. 401 defines "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." "Relevancy is tested by the probative value the evidence has with respect to the points at issue." State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990). As our Supreme Court has held:

> Evidence is relevant if it has a tendency in reason to prove or disprove any fact of consequence to the determination of the action. Relevancy consists of probative value

13                                                    A-2758-14T3

and materiality. Probative value is the tendency of the evidence to establish the proposition that it is offered to prove. A material fact is one which is really in issue in the case. Thus, our inquiry focuses on the logical connection between the proffered evidence and a fact in issue. Evidence need not be dispositive or even strongly probative in order to clear the relevancy bar. It need only have some tendency to prove a material fact. The inquiry is whether the thing sought to be established is more logical with the evidence than without it.

[State v. Buckley, 216 N.J. 249, 261 (2013) (citations omitted).]

The relevancy determination requires consideration of the statutory elements that the State must prove. Id. at 262.

Generally, all relevant evidence is admissible. N.J.R.E. 402. Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible unless an exclusion is warranted under a specific evidence rule. State v. Burr, 195 N.J. 119, 127 (2008). Relevant evidence may be excluded if "its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury or undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. "The mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Swint, 328 N.J. Super. 236, 253 (App. Div.), certif. denied, 165 N.J. 492 (2000).

"Evidence claimed to be unduly prejudicial is excluded only when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." State v. Long, 173 N.J. 138, 163-64 (2002) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)). Although the evidence is likely to be unpleasant and cause emotional stirring, that of itself does not render it inadmissible. State v. Sanchez, 224 N.J. Super. 231, 250 (App. Div.), certif. denied, 111 N.J. 653 (1988) (citing State v. Micheliche, 222 N.J. Super. 532, 545 (App Div.), certif. denied, 109 N.J. 40 (1987)). The fact that evidence may be cumulative does not render it inadmissible. Micheliche, supra, 222 N.J. Super. at 545 (citation omitted).

Defendant was charged with first-degree murder under N.J.S.A. 2C:11-3(a)(1) and (2), which required the State to prove beyond a reasonable doubt that he purposely or knowingly caused Everett's death or serious bodily injury that then resulted in Everett's death. See Model Jury Charge (Criminal), "Murder (N.J.S.A. 2C:11-3a(1) and 3a(2))" (2004). The cell phone video showed defendant repeatedly kicking and stomping Everett in the head as Everett lay motionless on the ground. There was evidence that Everett was alive during the video recording and died from a fatal concussion

caused by blunt force trauma to the head. Accordingly, the video was relevant because it tended to prove that defendant purposely or knowingly caused Everett's death or serious bodily injury that then resulted in Everett's death. Because defendant disputed the cause of death, the video had significant probative value and was material as to the cause of death, an issue that related directly to the murder charges.

The video's probative value was not so substantially outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of defendant's guilt or innocence. The fact that the video was disturbing and upsetting does not detract from the fact that it was legitimately a part of the State's proof of defendant's criminal state of mind. From the video, the jury could infer that the attack was performed with such ferocity that it could only have been the product of a knowing purpose to cause death.

The video afforded the jurors the opportunity to see the incident as it occurred; assisted them in understanding the event and defendant's acts and state of mind; assisted them in understanding and evaluating the eyewitness and expert testimony; and its repeated playing afforded them several opportunities to determine whether Everett was alive or dead during the recording.

16                                                      A-2758-14T3

We therefore find no merit to defendant's argument that the video was inadmissible under N.J.R.E. 402 and N.J.R.E. 403.

III.

At the close of the State's case, defendant moved for a judgment of acquittal on the murder charges. He argued there was no evidence as to how Everett collapsed or was seen prone on the ground. He also argued that Dr. Cronin's conclusions were assumptions and "[there was] nothing medically, forensically that [could] substantiate that [defendant's] actions caused" Everett's death.

Relying on State v. Reyes, 50 N.J. 454 (1967), the judge denied the motion, finding there was eyewitness testimony from which the jury could reasonably infer that defendant beat Everett to the ground. The judge also found that the jury could find beyond a reasonable doubt that defendant purposely or knowingly caused Everett's death based on evidence that defendant repeatedly kicked and stomped Everett in the head and that blunt force trauma to Everett's head caused a fatal concussion that resulted in his death.

In Point II, defendant argues there was only speculative proof that his actions caused Everett's death because Dr. Cronin did not couch her opinion within a reasonable degree of medical certainty. We disagree.

17

We use the same standard as the trial judge in reviewing a motion for judgment of acquittal at the close of the State's case. State v. Bunch, 180 N.J. 534, 548-49 (2004). We must determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [Reyes, supra, 50 N.J. at 459.]

Under Rule 3:18-1, the court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977), certif. denied, 77 N.J. 473 (1978). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

The proof that defendant's actions caused Everett's death was far from speculative. Viewing the cell phone video and eyewitness and expert testimony as a whole, and giving the State all favorable inferences therefrom, there was ample evidence on which a reasonable jury could find defendant guilty of first-degree murder under N.J.S.A. 2C:11-3(a)(1) and (2) beyond a reasonable doubt. Whether Dr. Cronin used the exact words "within a reasonable degree of medical certainty" during her testimony is immaterial. As we

18

observed in Eckert v. Rumsey Park Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996) (quoting Aspiazu v. Orgera, 535 A.2d 338, 342 (Conn. 1987), it is not necessary for a testifying expert to use the "'talismanic' or 'magical words' represented by the phrase 'reasonable degree of medical certainty.'" Dr. Cronin's expert opinion that blunt force trauma to Everett's head caused a fatal concussion that resulted in his death was sufficient for any rational jury to find defendant guilty of the murder charges beyond a reasonable doubt. State v. Martin, 119 N.J. 2, 8 (1990).

IV.

Prior to the trial, defendant filed a motion to dismiss the indictment, arguing that the prosecutor withheld exculpatory evidence, specifically, Dr. Thoma's neuropathology report and evidence that Everett died from cardiac arrest caused by acute PCP intoxication. The judge denied the motion, finding that defendant did not present evidence supporting his claim that Everett died from cardiac arrest caused by acute PCP intoxication. The judge also found that even if such evidence existed, defendant did not allege or show that the State had actual knowledge of it. In Point III and in Point I of his pro se supplemental brief, defendant reiterates the argument made to the judge.

"[O]ur courts have long held that a dismissal of an indictment is a draconian remedy and should not be exercised except on the

clearest and plainest ground." State v. Williams, 441 N.J. Super. 266, 271-72 (App. Div. 2015) (quoting State v. Peterkin, 226 N.J. Super. 25, 38 (App. Div.), certif. denied, 114 N.J. 295 (1988)). "Dismissal is the last resort because the public interest, the rights of victims and the integrity of the criminal justice system are at stake." State v. Ruffin, 371 N.J. Super. 371, 384 (App. Div. 2004).

The decision whether to dismiss an indictment lies within the trial court's discretion, State v. Saavedra, 222 N.J. 39, 54 (2015) and should not be overturned unless the court's discretion was "clearly abused." State v. Hogan, 144 N.J. 216, 229 (1996). The trial court's discretion should only be "disturbed . . . on the 'clearest and plainest ground'" and only when the indictment is "'palpably defective.'" Id. at 228-29 (quoting State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 18-19 (1984)). As long as an indictment alleges all of the essential facts of the crime, the charge is deemed sufficiently stated. State v. Fleischman, 383 N.J. Super. 396, 398-99 (App. Div. 2006), aff'd, 189 N.J. 539 (2007).

The State is not required to present potentially exculpatory evidence to the grand jury unless such evidence "directly negates the guilt of the accused and is clearly exculpatory." Hogan, supra, 144 N.J. at 237. The second requirement, that the evidence

20

is clearly exculpatory, demands "an evaluation of the quality and reliability of the evidence [and its] exculpatory value . . . should be analyzed in the context of the nature and source of the evidence, and the strength of the State's case." Ibid. The Court cautioned that an indictment should be dismissed on this ground "only after giving due regard to the prosecutor's own evaluation of whether the evidence in question is 'clearly exculpatory[,]'" id. at 238, and "only in the exceptional case will a prosecutor's failure to present exculpatory evidence to a grand jury constitute grounds for challenging an indictment[,]" id. at 239.

The prosecutor did not withhold exculpatory evidence from the grand jury. At the time of the grand jury proceeding, Dr. Hua's expert report was not available, and there was no evidence that Everett died from cardiac arrest caused by acute PCP intoxication. In addition, Dr. Thoma's neuropathology report was not exculpatory, as she did not dispute Dr. Cronin's conclusion as to cause of death. Because there was no evidence that directly negated defendant's guilt that was clearly exculpatory, the judge properly denied the motion to dismiss the indictment.

V.

The judge gave a circumstantial evidence charge that mirrored Model Jury Charge, "Circumstantial Evidence" (1993), and used the following illustration:

A simple illustration may be helpful. The problem is proving that Little Johnny ate the blueberry pie. Direct evidence would be testimony indicating that Little Johnny's mother saw him eat the blueberry pie. Circumstantial evidence would be testimony indicating that Little Johnny was seated at the kitchen table with the blueberry pie in front of him, Mom leaves the kitchen to check on Little Johnny's sister, Little Jane.

When Mom comes back to the kitchen, Little Johnny is still seated at the kitchen table. The blueberry pie is gone, but Little Johnny has crumbs all over his lips. The former directly goes to prove the fact that Little Johnny ate the blueberry pie while the latter establishes facts from which the inference that Little Johnny ate the blueberry pie may be drawn.

In Point IV, and Point III of his pro se supplemental brief, defendant contends for the first time that the circumstantial evidence charge was prejudicial because it amounted to a virtual invitation to convict. Defendant focuses on the blueberry pie illustration and argues that "it posited a situation in which the actor is clearly guilty and any denial by the actor clearly ridiculous."

"Appropriate and proper jury charges are essential to a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). "The trial court must give a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Id. at 159 (quoting State v. Green, 86

22

N.J. 281, 287-88 (1981)). "Thus, the court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" Ibid. (quoting Reddish, supra, 181 N.J. at 613). "Because proper jury instructions are essential to a fair trial, erroneous instructions on material points are presumed to possess the capacity to unfairly prejudice the defendant." Ibid. (quoting Bunch, supra, 180 N.J. at 541-42).

When a defendant fails to object to an error regarding a jury charge, we review for plain error. State v. Funderburg, 225 N.J. 66, 79 (2016). "Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough. To warrant reversal . . . an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

There was no error, let alone plain error, in the circumstantial evidence charge. The judge gave a charge that properly instructed the jury on the elements of circumstantial evidence. The judge emphasized it was the State's burden to prove

its case beyond a reasonable doubt, and that the jury could find defendant guilty by either direct or circumstantial evidence, or a combination of both types of evidence. The judge further instructed that defendant could be found not guilty by either direct or circumstantial evidence, both types of evidence, or a lack of evidence. The judge's blueberry pie illustration caused defendant no prejudice whatsoever.

VI.

At sentencing, the judge found three aggravating factors, including N.J.S.A. 2C:44-1(a)(2) (aggravating factor two):

> The gravity and seriousness of harm inflicted on the victim, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance[.]

In applying aggravating factor two, the judge found as follows:

> [Defendant] knew, or reasonably should have known, that the victim of the offense was particularly vulnerable or incapable of resistance. The evidence is incontrovertible that while the victim was down on the ground, face down on the ground, motionless and defenseless that defendant stomped his head over and over and over again. Frankly, I was shocked that with that ferocious stomping the victim's head wasn't split open because the attack was so ferocious. It was as if [the victim's] head was like a football? And like [defendant] was practicing place kicking.

24

The judge then considered the factors in State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986), and found that the crimes of murder and theft and their objectives were predominantly independent of each other, and the crimes involved separate acts of violence, or threats or violence because the theft was related to reaching into Everett's back pocket while the physical attack on Everett centered on stomping his head. The judge imposed a fifty-year term of imprisonment on the murder conviction subject to NERA, and a consecutive four-year term of imprisonment on the theft conviction.

In Point V, defendant argues that aggravating factor two was not supported by the evidence and constituted double counting. Defendant also argues that the judge did not conduct a comprehensive Yarbough analysis in imposing the consecutive sentence.

We review a judge's sentencing decision under an abuse of discretion standard. State v. Fuentes, 217 N.J. 57, 70 (2014). As directed by the Court, we must determine whether:

> (1) the sentencing guidelines were violated;
> (2) the aggravating and mitigating factors
> found by the sentencing court were not based
> upon competent and credible evidence in the
> record; or (3) the application of the
> guidelines to the facts of [the] case makes
> the sentence clearly unreasonable so as to
> shock the judicial conscience.

> [Ibid. (quoting State v. Roth, 95 N.J. 334,
> 364-65 (1984)).]

Regarding aggravating factor two our Supreme Court has explained:

> When a sentencing court considers the harm a
> defendant caused to a victim for purposes of
> determining whether that aggravating factor is
> implicated, it should engage in a pragmatic
> assessment of the totality of harm inflicted
> by the offender on the victim, to the end that
> defendants who purposely or recklessly inflict
> substantial harm receive more severe sentences
> than other defendants.
>
> [State v. Kromphold, 162 N.J. 345, 358
> (2000).]

Aggravating factor two is "broader and less precise" than serious bodily injury, but enables the court to determine whether the degree of harm to the victim warrants its application as an aggravating factor. Ibid. Aggravating factor two "focuses on the setting of the offense itself with particular attention to any factors that rendered the victim vulnerable or incapable of resistance at the time of the crime." State v. Lawless, 214 N.J. 594, 611 (2013) (citation omitted). Aggravating factor two "does not limit 'vulnerability' to age or other physical disabilities of the victim." State v. O'Donnell, 117 N.J. 210, 218-19 (1989). If "a victim is so constrained as to make physical resistance virtually impossible, he or she has been rendered vulnerable within the meaning of [N.J.S.A. 2C:44-1(a)(2)]. Id. at 219.

26                                          A-2758-14T3

"It is well-settled that where the death of an individual is an element of the offense, that fact cannot be used as an aggravating factor for sentencing purposes." State v. Carey, 168 N.J. 413, 425 (2001) (citation omitted). Sentencing courts must avoid double-counting facts that establish the elements of the relevant offense in making that determination. Fuentes, supra, 217 N.J. at 74-75. However, in the context of aggravating factor N.J.S.A. 2C:44-1(a)(1),[2] the Court reasoned:

> In appropriate cases, a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense. . . . A sentencing court may consider aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.
>
> [Id. at 75 (citations omitted).]

Applying this reasoning to aggravating factor two, a court may apply this aggravating factor and "focus[] on the setting of the offense itself with particular attention to any factors that rendered the victim vulnerable or incapable of resistance at the time of the crime." Lawless, supra, 214 N.J. at 611; see also State v. Ramseur, 106 N.J. 123, 208 (1987) (holding that "cruel" conduct may give rise to an aggravating factor in a manslaughter

---

[2] "The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner[.]" N.J.S.A. 2C:44-1(a)(1).

sentencing when the defendant intended to inflict pain, harm and suffering in addition to intending death).

The record amply supports the judge's findings on aggravating factor two, and there was no double counting of the elements of the murder offense. Defendant viciously and repeatedly kicked and stomped Everett in the head to the point where Everett was rendered vulnerable or incapable of resistence within the meaning of aggravating factor two. O'Donnell, supra, 117 N.J. at 219. The violent attack on Everett more than justified the finding of that aggravating factor.

Lastly, there was no error in the imposition of a consecutive sentence. In Yarbough, supra, 100 N.J. at 639, the Court identified the relevant criteria for determining when consecutive, as opposed to concurrent, sentences should be imposed. The Court noted that it is "senseless" to give a criminal free crimes. Instead, a sentencing court should consider the factual content of the crimes, including whether or not: (1) the crimes and their objectives were predominantly independent of each other; (2) the crimes involved separate acts of violence or threats of violence; (3) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior; (4) any of the crimes involved multiple victims; and (5) the convictions for

28

which the sentences were imposed were numerous.  Id. at 644.  These five factors are to be applied qualitatively, rather than quantitatively.  A consecutive sentence can be imposed, even if a majority of the Yarbough factors support concurrent sentences. Carey, supra, 168 N.J. at 427-28.

Here, the murder and theft had different objectives, the first being to purposely or knowingly cause Everett's death or serious bodily injury that then resulted in his death, and the second being to knowingly or unlawfully commit a theft from Everett's person.  Each offense was separate and distinct and required its own punishment to address the particular harm to Everett.  When all of the sentencing factors are viewed, either qualitatively or quantitatively, the judge properly imposed a consecutive sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION