NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4755-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

SCOTT M. HAHN,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

August 17, 2022

APPELLATE DIVISION

Argued March 30, 2022 – Decided August 17, 2022

Before Judges Messano, Accurso and Marczyk.

On appeal from the Superior Court of New Jersey,
Law Division, Hudson County, Indictment No. 16-09-
1174.

Marcia Blum, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; Marcia Blum, of counsel
and on the brief).

Patrick R. McAvaddy, Assistant Prosecutor, argued
the cause for respondent (Esther Suarez, Hudson
County Prosecutor, attorney; Patrick R. McAvaddy, on
the brief).

    The opinion of the court was delivered by

MESSANO, P.J.A.D.

On Monday afternoon, February 22, 2016, defendant Scott Hahn exited the Holland Tunnel from New York City and drove southbound on the New Jersey Turnpike extension toward the toll booths at Interchange 14C in Jersey City. Timothy O'Donnell was also proceeding southbound and stopped his car to obtain a toll ticket at the left-most toll booth; his five-year-old daughter was in the backseat. Defendant's car slammed into the O'Donnell car, propelling it into oncoming traffic, where there was a second collision with an ambulance van. O'Donnell was pronounced dead at the scene; his daughter died en route to the Jersey City Medical Center.

A Hudson County grand jury returned an indictment charging defendant with two counts of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a) (counts one and two), two counts of second-degree vehicular homicide, N.J.S.A. 2C:11-5(a) (counts three and four), one count of third-degree possession of gamma hydroxybutyrate (GHB), N.J.S.A. 2C:35-10.2(a) (count five), and one count of third-degree possession of a controlled dangerous substance, gamma-butyrolactone (GBL), N.J.S.A. 2C:35-10(a)(1) and (3) (count six). A jury convicted defendant of all counts.

The judge denied defendant's motion for judgment notwithstanding the verdict or alternatively a new trial. After merging the vehicular homicide convictions into the aggravated manslaughter convictions, the judge sentenced

defendant to consecutive sixteen-year terms of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge imposed concurrent five-year terms of imprisonment on the two drug convictions but ordered they run consecutive to the manslaughter convictions. In the aggregate, the judge imposed a thirty-seven-year term of imprisonment, with a twenty-seven-year, two-month, and eleven-day period of parole ineligibility.

Defendant raises the following issues for our consideration:

POINT I

DEFENDANT'S STATEMENT MUST BE SUPPRESSED BECAUSE THE POLICE FAILED TO HONOR HIS ATTEMPTS TO EXERCISE HIS MIRANDA[1] RIGHTS AND WITHHELD INFORMATION ESSENTIAL TO AN INFORMED WAIVER OF HIS RIGHTS, RESULTING IN A WAIVER THAT WAS NEITHER KNOWING AND INTELLIGENT NOR VOLUNTARY.[2]

POINT II

THE OMISSION OF A CHARGE ON SECOND-DEGREE MANSLAUGHTER AS A LESSER-INCLUDED OFFENSE OF FIRST-DEGREE AGGRAVATED MANSLAUGHTER IS REVERSIBLE ERROR. (Not Raised Below)

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] We have eliminated the subpoints in defendant's brief.

3                                                                      A-4755-18

POINT III

THE ASSURANCE THAT THE EXPERT OPINIONS OF THE STATE'S PSYCHOPHARMACOLOGIST AND ITS ACCIDENT-RECONSTRUCTIONIST WERE BASED ON "A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY" VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL. (Not Raised Below)

POINT IV

THE SENTENCE OF [THIRTY-SEVEN] YEARS, [TWENTY-SEVEN] YEARS AND TWO-AND-[ONE]-HALF MONTHS WITHOUT PAROLE, IS BASED ON FLAWED FINDINGS OF AGGRAVATING AND MITIGATING FACTORS AND A FAILURE TO CONSIDER THE OVERALL FAIRNESS OF THE CONSECUTIVE, AGGREGATE TERM, AND IS EXCESSIVE.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

The State's evidence at trial included data retrieved from defendant's Mercedes. The vehicle's computer revealed defendant's car was going fifty-three miles per hour when the crash occurred. Subsequent investigation of the Mercedes revealed no defects or mechanical problems that may have caused the crash.

Defendant told a responding New Jersey State Police (NJSP) Trooper that he had a seizure, and he was taken by ambulance to the Jersey City

4                                                                        A-4755-18

Medical Center. Although he denied at the scene having taken any drugs, defendant acknowledged at the hospital emergency room that he took an amphetamine, Adderall, over the weekend. Blood drawn from defendant pursuant to a warrant approximately four hours after the crash revealed the presence of methamphetamines, amphetamines, and GHB.

The day after the crash, while still hospitalized, defendant waived his Miranda rights and provided a formal audio statement to Detective Adam Brozek, assigned to the NJSP Homicide North Unit. Among other things, defendant admitted having ingested Adderall over the prior weekend. The statement was played for the jury, and we discuss further its contents below.

A search of defendant's car pursuant to a warrant resulted in the recovery of an eyedropper bottle from the passenger side floorboard and a clear plastic bottle under the driver's seat, both containing liquid. The eyedropper bottle contained GBL, and the plastic bottle contained mostly GHB with a small portion of GBL. The State's expert forensic toxicologist, Bridget Verdino, explained GHB is an illegal central nervous system depressant taken to produce euphoria, but once the euphoria wears off, the drug causes "drowsiness, dizziness, and overall depression of heart rate, blood pressure, [and] loss of motor coordination." GBL is a precursor drug that becomes GHB when ingested.

5

Dr. Robert Pandina, the State's expert in psychopharmacology who specializes in the effects of drugs on human physiology and behavior, explained that high doses of amphetamines like Adderall engender feelings of well-being and excitement, and can cause drivers to speed up, or take risks, and can affect their attention in controlling their vehicle. However, Pandina could not opine that defendant was under the influence of amphetamines or methamphetamines at the time of the crash.

Pandina explained that GHB, a synthetic drug which "mimic[s] the effects of naturally-occurring" opiates such as heroin and morphine, acts as "a central nervous system depressant" and may be prescribed to treat anxiety and serious sleep disorders. Because GHB is a sedative, it "slow[s a person's] reaction time . . . decrease[s the] ability to react . . . appropriately to the environmental demands," and affects a person's "focus." Combining the "upper" of an amphetamine or methamphetamine with the "downer" of GHB may potentially cause an erratic interaction or may prolong the "euphoric effect."

Pandina opined defendant "was under the influence of GHB at the time of the crash, . . . the GHB level was significantly higher at the time of the crash than when his blood was tested four hours later, and . . . it . . . would cause impairment in fundamental abilities to operate a motor vehicle." He

6

further opined defendant's level of impairment was "a significant contributing factor to the crash."

The jury also heard from a driver who saw defendant slumped over the wheel of his car, apparently asleep, while stopped at a traffic light after emerging from the Holland Tunnel. The driver of the ambulance that struck the O'Donnell vehicle also testified, and the jury saw video traffic camera footage of the actual crash.

Defendant produced a forensic toxicologist as an expert to criticize the NJSP lab procedures, refute the level of GHB in defendant's blood, and question whether the drug "may or may not [have been] present." Defendant also testified that he suffered a seizure as he emerged from the Holland Tunnel. He did not know how GHB was in his system, or in his car, and claimed to have discovered the bottle in his overnight bag, opened it, and spilled some on his lap, burning his skin. As for the presence of methamphetamines in his blood, defendant assumed it was due to second-hand smoke he was exposed to on the previous Saturday and Sunday night while spending time with friends who were smoking crystal meth.

## II.

We consider the arguments raised by defendant in Point I regarding the audio-recorded statement he provided the day after the crash while in the

hospital. As the prosecutor recognized in his opening statement, "[s]ome of the admissions that . . . defendant made are . . . crucial in this case." A judge, who was not the trial judge, conducted a hearing pursuant to N.J.R.E. 104(c) regarding the admissibility of the statement. Detective Brozek testified at the hearing.[3]

Brozek described meeting defendant at the Jersey City Medical Center on the morning of February 23, 2016, after obtaining permission from medical personnel attending to defendant to speak with him. Defendant was alert and able to answer questions. Brozek advised defendant he, along with Detectives Christian Velazquez and Jason Kazan, were "currently investigating the motor vehicle crash and how it occurred." Brozek testified defendant was not under arrest because "[t]here was still an ongoing investigation into the crash." He

---

[3] At trial, defendant testified that he asked police when he first arrived at the hospital if other people were injured, and they told him, "Let's worry about you right now." Defendant also testified at trial that when the troopers arrived to question him at the hospital, he asked again; they only said, "everything's fine," and they were interviewing other people that day about the accident.

Defendant did not testify or call any witnesses at the N.J.R.E. 104(c) hearing. These alleged facts, therefore, were not before the hearing judge, and we do not consider them in our review of the judge's decision on the admissibility of defendant's statement. Cf. State v. Tavares, 364 N.J. Super. 496, 501 (App. Div. 2003) (explaining in the analogous context of a motion to suppress physical evidence, "[T]he only proofs relevant on appellate review of the motion to suppress are the proofs at the motion hearing.").

advised defendant of his <u>Miranda</u> rights and had defendant sign a <u>Miranda</u> waiver card. The audiotaped statement includes defendant's oral responses to the detective's questions, including defendant's affirmations that he understood his rights and felt well enough to give a statement.

The following colloquy[4] transpired:

> Det. Brozek: So[,] you wish to continue with the interview?
>
> Defendant: Can I ask a question? Just because I'm sure . . . my car is the one that caused all this, I should probably have an attorney present?[5]
>
> Det. Brozek: Okay. Like I said, it's a pending investigation we have. I'm in the unit with the State Police that's currently investigating the motor vehicle crash and how it occurred, and we're trying to get –

---

[4] We compared the transcript of the <u>Rule</u> 104 hearing, with the trial transcript of the audio recording as played for the jury, and the transcript of playbacks the jury requested during its deliberations. We also compared these to the judge's written decision, which included her findings following the <u>Rule</u> 104 hearing and relied in part on a transcript of the statement furnished by the State, which is not in the appellate record. The parties' briefs sometimes cite the record differently. We rely on the official certified transcript from the <u>Rule</u> 104 hearing, and none of the differences between the versions affects our decision.

[5] This is an example of the discrepancies to which we alluded. The transcriber placed a question mark at the end of this sentence in the transcript of the <u>Rule</u> 104 hearing. However, the same transcriber placed a period instead of a question mark in the trial transcript and the transcript of the playback during deliberations. We have listened to the recorded statement; it does appear defendant was asking a question.

Defendant: Right.

Det. Brozek: — you know, surveillance footage. So as far as a final . . . result of the investigation, that's still pending. We have no final result on the investigation just yet.

Defendant: Okay.

. . . .

Det. Brozek: So[,] you wish to continue?

Defendant: Yeah.

Det. Brozek: Okay. All right.

Before Detective Brozek could ask anything more than defendant's name and

address, Detective Kazan clarified whether defendant was asking for an

attorney:

Det. Kazan: Mr. Hahn, you just mentioned you were talking about an attorney. At this time[,] are you requesting the presence of an attorney? Is that what you're saying? Or not requesting that?

Defendant: I'm . . . I guess what I'm asking is, . . . if this . . . accident did turn out to be my fault, . . . I should probably have an attorney present, right?

Det. Brozek: We can't advise you on that. . . .

Det. Kazan: We can only advise you that it's your right to have an —

Det. Brozek: Request it.

10

Det. Kazan:  — attorney present. . . .  To request an attorney present.

Det. Brozek:  If you're requesting the presence of an attorney, that's what we're asking you.  At this time, are you requesting the presence of an attorney?

Defendant:  No. I guess, I mean.

Det. Kazan:  We can show you the questions if you wanted to —

Det. Brozek:  Yeah.

Det. Kazan:  — look at them.

. . . .

Det. Kazan:  You're welcome to look at the template, like you said.  The same question —

Defendant:  It's not that.  It's not that.  It's just, I mean, . . . I'm an honest person.  It's just that —

Det. Kazan:  Okay.  Yeah.

Defendant:  — I don't know, like, saying something too soon.

Det. Brozek:  Like I said, we can't tell you, you know, what you should do.

Defendant:  Okay.

Det. Brozek:  We can't give you like —

Defendant:  That's fine.

Det. Brozek:  — legal advice what you should do.  What . . . we have to do is just, kind of, advise you of

11

your legal right, that you can have an attorney present. So[,] do you wish to have one present?

Defendant: It's — it's okay.

Det. Brozek: So then —

Det. Kazan: That's fine.

Det. Brozek: Okay. Just wanted to be clear.

Det. Kazan: So[,] at this time, you're declining the presence of an attorney.

Defendant: Yeah.

Det. Kazan: Is that correct, Mr. Hahn?

Defendant: Yeah.

Det. Kazan: Thank you very much.

Defendant proceeded to answer all the questions posed and never stopped the interview or requested an opportunity to consult with an attorney.

Defendant said he suffered a seizure while coming through the Holland Tunnel. His seizures were "stress related," and doctors had specifically concluded he was not epileptic. Defendant recalled his eyes "crossed" as he exited the tunnel, he "couldn't undo them," and he was unable to pull to the side of the road. Defendant wore prescription glasses but had lost them and believed they might have helped him when his eyes "crossed." Defendant had no idea he struck another vehicle.

A-4755-18

Defendant told the troopers he was visiting a friend in New York over the weekend and helping him move. Defendant slept until 1 p.m. on Sunday but had not slept again before the accident, which occurred at 3:19 p.m. on Monday. Defendant's friend gave him ten Adderall pills Sunday, telling defendant they were "caffeine pill[s]." Defendant took all of them intermittently, starting about 1 p.m. on Sunday and taking the last pill before sunrise on Monday. Defendant denied taking any other drugs, except medicine prescribed for his bleeding ulcer, and thought moving furniture with his friend and staying up all night may have created the stress that caused his seizure. The statement took approximately thirty-five minutes to complete.

Before the hearing judge, defendant argued the troopers did not scrupulously honor his request for counsel after he waived his Miranda rights, and the troopers' claim to still be investigating an "accident" was misleading. The judge reserved decision and subsequently issued a written opinion permitting the State to introduce defendant's statement at trial.

The judge found Brozek was a credible witness. Relying primarily on State v. Alston, 204 N.J. 614 (2011), the judge concluded defendant's inquiry regarding counsel "was neither an assertion of his right to counsel, ambiguous or otherwise." Further, the judge concluded:

> Even if . . . [d]efendant's repeated inquiry [w]as an
> ambiguous assertion requiring clarification, the record

13

> clearly indicates that Detectives Brozek and Kazan took ample time to re-<u>Mirandize</u> . . . [d]efendant, clarify whether he understood his rights, and ensure [d]efendant understood the potential consequences with regards to his waiver before any further questioning took place.

The judge found defendant made a knowing, voluntary waiver of his <u>Miranda</u> rights, but she did not address whether the troopers were obligated to clarify they were investigating a traffic accident that resulted in two deaths and whether their failure to do so vitiated the knowing and voluntary nature of defendant's waiver.

## A.

Before us, defendant reiterates the troopers did not scrupulously honor, but rather discouraged, his attempts to invoke his right to counsel. He also claims that because the troopers "withheld essential information," i.e., that two people died in the accident, defendant did not know his "true status," and, therefore, he did not make a knowing, intelligent and voluntary waiver of his <u>Miranda</u> rights. The State counters by arguing the troopers clarified any ambiguity regarding defendant's invocation of his right to counsel, were under no obligation to disclose the full nature of their investigation, and defendant voluntarily waived his <u>Miranda</u> rights and provided the statement.

"[O]ur review requires that we 'defer to the factual findings of the trial court . . . supported by sufficient evidence in the record,' because a trial court's

14

decision is influenced by the opportunity to hear and see the witnesses." State v. Gonzalez, 249 N.J. 612, 628 (2022) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). "When, as here, we consider a ruling that applies legal principles to the factual findings of the trial court, we defer to those findings but review de novo the application of those principles to the factual findings." State v. Hinton, 216 N.J. 211, 228 (2013) (citing State v. Harris, 181 N.J. 391, 416 (2004)); see also State v. A.M., 237 N.J. 384, 396 (2019) ("An appellate court owes no deference, however, to 'conclusions of law made by lower courts in suppression decisions' . . . . " (quoting State v. Boone, 232 N.J. 417, 426 (2017))).

We reject any contention that the troopers did not properly respond to what may have been defendant's ambiguous request for counsel. Most recently, the Court reaffirmed Alston's prior guidance, and held "in situations where 'a suspect's statement "arguably" amount[s] to an assertion of Miranda rights,' conducting a follow-up inquiry is the only way to ensure that a suspect's waiver of their right was knowing and voluntary." Gonzalez, 249 N.J. at 630 (alteration in original) (quoting Alston, 204 N.J. at 621–23).

In Alston, the Court held the defendant's response to the officer's question whether the defendant wanted a lawyer — "No, I'm asking you guys, man." — was not "even an ambiguous request for counsel; rather, it was an

emphatic 'no' followed by a continued effort to secure advice and guidance from the police about what they thought [his] best course of action was at the time." 204 N.J. at 626. In Gonzalez, the Court distinguished Alston and held, the "defendant's first mention of counsel, '[b]ut what do I do about an attorney and everything?' was an ambiguous invocation of her right to counsel that required the detective to cease all questioning and seek clarification." 249 N.J. at 631 (alteration in original). The detective's response — "I can't give you an opinion about anything" — "failed to clarify what [the] defendant meant." Id. at 632.

In this case, the troopers carefully explained defendant had the right to have counsel, and while they could not advise whether he should request counsel, they clearly explained defendant had the right not to proceed without an attorney present. They also sought defendant's unequivocal affirmation that he wished to proceed. We find no error. The more difficult issue, considering the recently evolving legal landscape, is whether defendant knowingly and voluntarily waived his rights given the troopers' failure to advise him that the crash resulted in two deaths, and they were assigned to the homicide unit of the NJSP.

B.

16                                                                    A-4755-18

In State v. A.G.D., the Court held that a defendant's waiver of his Miranda rights is invalid when police fail to inform him that a criminal complaint has been filed or an arrest warrant has been issued against him. 178 N.J. 56, 58–59 (2003). The Court reasoned, "a criminal complaint and arrest warrant signify that a veil of suspicion is about to be draped on the person, heightening his risk of criminal liability." Id. at 68. "[R]egardless of other factors that might support his confession's admission[,]" a defendant cannot make an intelligent waiver when unaware of "his true status." Ibid.

In State v. Nyhammer, the Court clarified that A.G.D. was limited to its facts. 197 N.J. 383, 404–05 (2009). In Nyhammer, the defendant argued his waiver was invalid because police failed to disclose he was a suspect when they questioned him. Id. 387–88. The Court emphasized the critical difference from A.G.D. was the issuance of the arrest warrant in that case. Id. at 404. Although the defendant in Nyhammer was a suspect, the Court reasoned it would be impossible to foresee the actual charges that might be lodged against him. Id. at 405. As a result, the Court applied the totality-of-the-circumstances test and determined the failure to tell the defendant of his suspect status was "only one of the many factors to be considered[.]" Id. at 407–08.

In State v. Vincenty, the Court reaffirmed its adherence to A.G.D. and held that interrogating officers must not only inform a suspect that an arrest warrant or complaint has been issued but must also notify the defendant of the specific charges. 237 N.J. 122, 126 (2019). The Court concluded that police must provide a "simple declaratory statement" identifying those charges before questioning the defendant. Id. at 134.

In State v. Sims, detectives arrested the defendant for attempted murder prior to the issuance of a complaint-warrant. 466 N.J. Super. 346, 357 (App. Div. 2021). Although the defendant asked, "why he was under arrest," the detectives never told him prior to the defendant's waiver of his Miranda rights. Id. at 357–58. We held that "because [the] defendant was under arrest, he faced the same risk of self-incrimination as the defendants in A.G.D. and Vincenty. To find that he was not entitled to the same information as those defendants simply because he was arrested without a warrant would contravene both of the Court's holdings." Id. at 368.

The Court disagreed and reversed. State v. Sims, 250 N.J. 189, 197 (2022). Citing Judge Susswein's dissenting opinion from our court, the Court agreed that "even when there is probable cause for an arrest, there may be insufficient information about the victim's injuries, the arrestee's mental state, and other key issues to enable an officer to accurately identify the charges."

18

Id. at 215 (citing Sims, 464 N.J. Super. at 381–83). The Court found the majority opinion from our court "relie[d] not on an objective statement of the charges pending against the arrestee, but on an officer's prediction, based on information learned to date in a developing investigation, of what charges may be filed." Ibid. The Court affirmed the trial "court's application of the totality-of-the-circumstances standard to deny defendant's motion to suppress his statement." Id. at 217.

C.

Since the briefs were filed in this case, our court has issued two decisions, State v. Diaz, 470 N.J. Super. 495 (App. Div. 2022), filed before the Court issued its reversal in Sims, and State v. Cotto, 471 N.J. Super. 489 (App. Div. 2022), filed after the Court's decision in Sims. Defendant argues Diaz should control our disposition of his appeal, but both cases bear on our consideration of the issue presented.

In Diaz, police were investigating an overdose death with the aid of a cooperating witness, Ludeman, the decedent's roommate who used the same drugs and claimed they came from the defendant. Police arranged through Ludeman to purchase more of the same drugs from the defendant. 470 N.J. Super. at 503–05. When the defendant appeared outside the door of his residence, police approached, identified themselves, and read the defendant his

19

Miranda rights. Id. at 505. The defendant "asked the detective 'what [this] was about[,]'" and the detective "responded . . . 'we [are] conducting an investigation involving narcotics' and asked if defendant 'had anything on his person.' . . . Defendant then removed a 'bundle of heroin' from his pocket." Id. at 506 (first and third alterations in original).

The defendant was arrested and, at police headquarters, he provided a statement after again being Mirandized. Id. at 506–07. The detectives never told the defendant "what the interrogation was about," or "specif[ied] the potential criminal charges . . . [he] was facing"; at the time, no complaint or warrant had issued. Id. at 507. The defendant admitted providing eight bags of heroin to Ludeman the day of the overdose, and, after that admission, "the tenor and substance of the stationhouse interrogation changed." Ibid. Police for the first time "referred to an overdose," and explained the defendant was facing "a strict liability charge[,] . . . a manslaughter charge." Id. at 508.

The trial court denied the defendant's motion to suppress, concluding the statement was made following a knowing, voluntary and intelligent waiver of the defendant's Miranda rights. Id. at 509. On reconsideration, and relying on our decision in Sims, which at that time was pending before the Court, the judge reversed course and suppressed the statement. Id. at 510–11. The State appealed. Id. at 511.

We noted "the Court in <u>Nyhammer</u> stressed, 'evidence that the accused was threatened, <u>tricked</u>, or cajoled into a waiver of his [or her] privilege will render the waiver involuntary.'" <u>Id.</u> at 516 (alteration in original) (quoting <u>Nyhammer</u>, 197 N.J. at 407). We therefore "focus[ed] on whether the State proved beyond a reasonable doubt that [the] defendant knowingly waived his right against self-incrimination in view of the detectives' stratagem to withhold the fact that someone had died following defendant's act of distributing heroin to Ludeman." <u>Id.</u> at 518.

We concluded "the detectives in th[e] case affirmatively misled defendant as to his 'true status,' by providing a deliberately vague and incomplete answer to his question as to the reason why he was taken into custody." <u>Ibid.</u> (quoting <u>A.G.D.</u>, 178 N.J. at 68).

> It is one thing for police to withhold information. It is another thing entirely for them to provide an explanation that creates or reinforces a false impression as to the seriousness of the sentence that a defendant is facing. Any such deception or trickery as to the true reason a defendant is taken into custody, whether made in response to a question posed by the defendant, as in this case, or made on the police interrogator's own initiative, is an important circumstance to be considered as part of the totality of circumstances when determining whether the State has proved beyond a reasonable doubt that the defendant made a knowing and voluntary waiver of the right against self-incrimination.

> [Id. at 519. Cf. State v. L.H., 239 N.J. 22, 47–48 (2019) (noting that minimizing the seriousness of the crimes under investigation is a relevant factor under the totality of circumstances test).]

We concluded, "[T]he detectives were following a deliberate investigative strategy to withhold information about the overdose death from defendant until after he admitted that he sold heroin to Ludeman the day before." Id. at 522.

We also rejected the State's assertion that detectives lacked probable cause to charge the defendant with strict liability drug-induced death before questioning him. Id. at 527. "We . . . [we]re satisfied that at the time [the] defendant was taken into custody, the detectives were aware of facts that, viewed collectively, would lead an objectively reasonable police officer to believe that [the] defendant was criminally responsible for the victim's death." Id. at 528. As already noted, we issued our judgment in Diaz before the Court issued its decision in Sims.

In Cotto, detectives arrested the defendant for outstanding traffic warrants, while suspecting he was involved in an arson at a local nightclub. 471 N.J. Super. at 506. They told the defendant he was under arrest for the traffic warrants, but, after he waived his Miranda rights, they said they wanted to speak with him "about something else," and began questioning the defendant about his familiarity with the nightclub. Id. at 506–07. The detectives disclosed surveillance camera footage showing the person who

started the fire, told the defendant they believed it was him, and, although the defendant did not admit to the crime, the detectives told the defendant he would be charged with aggravated arson. Id. at 508–10. The trial court denied the defendant's motion to suppress the statement. Id. at 512.

We first noted and reviewed the Court's decision in Sims, as well as prior precedent. Id. at 512–18. We observed, "As Sims makes clear, . . . although [the] defendant indisputably was a suspect in the arson investigation, because charges had not been filed concerning that crime, the detectives were not required pursuant to a bright-line rule to alert defendant as to his suspect status during the initial Miranda waiver colloquy." Id. at 520 (citing Sims, 250 N.J. at 209).

We rejected the defendant's claim that detectives "strategically chose to . . . arrest [the defendant] for the outstanding traffic warrants, without mentioning the arson investigation, to obtain [his] Miranda waiver." Ibid. (first alteration in original). We noted assuming arguendo police had probable cause to arrest the defendant for the arson before the interrogation, there was no "evidence of bad-faith interrogation tactics that violated [the] defendant's constitutional rights." Ibid.

We distinguished Diaz, "where police interrogators deliberately withheld information that a person had died from a drug overdose until after the

defendant had admitted to police that he distributed a controlled dangerous substance (CDS) to the victim's roommate on the day of the overdose death." Id. at 521 (citing Diaz, 470 N.J. Super. at 520). "In stark contrast to the situation in Diaz, here . . . [the] defendant was told before he answered any substantive questions that the subject matter of the interrogation would not focus on the traffic warrants for which he was arrested." Id. at 522. We held, "accounting for all relevant circumstances militating for and against suppression, we are satisfied that the manner in which this custodial interrogation was conducted was lawful and does not offend contemporary notions of justice and fair play." Id. at 523.

D.

Applying these principles to the facts of this case, we conclude the NJSP detectives did not engage, as did the investigators did in Diaz, in a "'carefully orchestrated' custodial interrogation . . . designed to affirmatively mislead . . . defendant." Id. at 521 (citing Sims, 250 N.J. at 222). They truthfully told defendant they were investigating the motor vehicle crash from the day before. They accurately told defendant there was "no final result" from that investigation. They did not misrepresent, as did the detectives in Diaz, that they were there to investigate something else.

24

Defendant seemingly recognizes these factual differences because he argues while the NJSP detectives did not affirmatively misrepresent facts, they omitted facts known to them before the interrogation began. What facts were omitted? Defendant contends it was that two people died in the crash.[6]

However, in <u>Diaz</u>, police had sufficient probable cause to arrest the defendant for drug-induced homicide before interrogating him. When the defendant asked police "'what [this] was about,'" police told him they were conducting a narcotics investigation and asked if he "'had anything on his person.'" 470 N.J. Super. at 506 (alteration in original). Their strategic decision to withhold from the defendant any mention of a drug overdose was intended to "create[] or reinforce[]a false impression" of the consequences defendant actually faced. 470 N.J. Super. at 519.

Unlike <u>Diaz</u>, where police omitted information despite having sufficient probable cause to arrest the defendant for the drug-induced death before the interrogation even began, here, when they spoke with defendant, the NJSP detectives had not yet recovered the GHB and GBL bottles from defendant's car, had not conducted a forensic investigation of the car for possible mechanical problems, and did not know the results of defendant's blood draw.

---

[6] We also recognize that Detective Brozek never advised defendant that he (Brozek) was assigned to the NJSP Homicide Unit.

They were investigating a fatal accident, to be sure, and the troopers most likely knew defendant faced some criminal charges.[7]  But, they did not misrepresent the circumstances defendant faced in response to his direct inquiry.

We also hesitate to extend Diaz's holding beyond its facts in light of the Court's subsequent decision in Sims.  In Sims, the Court held that in the absence of the issuance of a formal complaint-warrant, police were under no obligation to tell the defendant why he was arrested, even though he specifically asked, and police already knew he would be charged with attempted murder.  See Sims, 250 N.J. at 199 (noting the "defendant asked, 'what was going on and why he was being placed under arrest,' and that [the interrogating detective] told [the]defendant that the officers 'would get into the details' when they reached the prosecutor's office").  Despite the interrogating detectives' intentional omission of the reasons for the defendant's arrest, the

---

[7]  In denying the motion to suppress defendant's blood drawn pursuant to a warrant, the judge noted observations made by police at the scene of defendant's slurred speech, glassy and bloodshot eyes, and inability to recall what happened as support for the warrant's application.  In addition, observations of the vehicles at the scene circumstantially supported a conclusion that defendant was travelling at excessive speed.  See State v. Parkhill, 461 N.J. Super. 494, 501 (App. Div. 2019) (holding "[e]xcessive speed may satisfy the recklessness element" of vehicular homicide (citing State v. Buckley, 216 N.J. 249, 262 (2013))).

Court nevertheless concluded under the totality of the circumstances, the defendant's motion to suppress was properly denied. Id. at 217–18. The omission of information known to the NJSP detectives in this case does not approach the significant omissions and vague answers supplied by the police in Sims.

In this case, the hearing judge considered other factors usually employed to determine whether "[i]n the totality-of-the-circumstances analysis," defendant's waiver "was the product of free will or police coercion." Nyhammer, 197 N.J. at 402. We find no reason to disturb the judge's factual findings in this regard or the legal conclusions she reached. We therefore affirm the decision to admit defendant's statement to NJSP detectives on the day after the accident.

III.

There is no transcript of the charge conference alluded to at other points in the record. In any event, the trial judge confirmed with defense counsel and the prosecutor that the proposed written charge she circulated was acceptable. The judge charged the jury on aggravated manslaughter and vehicular homicide, but she was not asked to and did not charge the jury on the lesser-included offense of aggravated manslaughter, i.e., second-degree reckless manslaughter. Nor did the judge ever explain that vehicular homicide is a

27

lesser-included offense of aggravated manslaughter when the death is caused by driving an automobile. See, e.g., State v. Locane, 454 N.J. Super. 98, 108, 112 (App. Div. 2018).

In Point II, defendant contends it was plain error for the judge not to provide instructions on reckless manslaughter as a lesser-included charge of aggravated manslaughter. The State responds the evidence clearly supported the jury's verdict on aggravated manslaughter, and the judge was under no obligation to sua sponte charge reckless manslaughter. At oral argument before us, the State also asserted that any error was harmless, because the jury found defendant guilty of both aggravated manslaughter and the lesser-included offense of vehicular homicide.

"We review for plain error the trial court's obligation to sua sponte deliver a jury instruction when a defendant does not request it and fails to object at trial to its omission." State v. Alexander, 233 N.J. 132, 141–142 (2018) (citing State v. Cole, 229 N.J. 430, 455 (2017); State v. Funderburg, 225 N.J. 66, 79 (2016)). "To warrant reversal, the unchallenged error must have been 'clearly capable of producing an unjust result.'" Id. at 142 (quoting R. 2:10-2). We conclude it was plain error for the judge not to provide instructions on the lesser-included offense of reckless manslaughter. The failure to do so "raise[s] a reasonable doubt as to whether the error led the jury

to a result it otherwise might not have reached." Ibid. (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

"[A]n offense is considered a lesser-included offense 'where the proof required to establish a greater offense is also sufficient to establish every element of a lesser offense' and 'where two offenses are the same but a lesser degree of culpability is required to establish the lesser offense.'" State v. Bell, 241 N.J. 552, 561 (2020) (quoting State v. Thomas, 187 N.J. 119, 129–30 (2006)); see also N.J.S.A. 2C:1-8(d) (defining an "included offense"). Pursuant to N.J.S.A. 2C:1-8(e), "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."

"Determining 'whether an included offense charge is appropriate requires (1) that the requested charge satisfy the definition of an included offense set forth in N.J.S.A. 2C:1-8(d), and (2) that there be a rational basis in the evidence to support a charge on that included offense.'" Bell, 241 N.J. at 562 (quoting State v. Cassady, 198 N.J. 165, 178 (2009)). "[A] trial court has an independent obligation to instruct on lesser-included charges . . . ." Funderburg, 225 N.J. at 76 (alteration in original) (emphasis added).

Second-degree reckless manslaughter is a lesser-included offense of aggravated manslaughter.

Generally, reckless manslaughter is a lesser-included offense of aggravated manslaughter. A second-degree crime, reckless manslaughter is distinguishable from aggravated manslaughter "in the degree of the risk that death will result; from defendant's conduct." For reckless manslaughter, the degree of risk is the "mere possibility" of death. To distinguish between aggravated manslaughter and reckless manslaughter, "[t]he ultimate question for the factfinder is whether the homicide was committed under circumstances involving a mere possibility of death[,] or did the circumstances involve a probability of death. If the former, the verdict must be reckless manslaughter, but if the latter the verdict must be aggravated manslaughter."

[State v. Ruiz, 399 N.J. Super. 86, 97–98 (App. Div. 2008) (alterations in original) (first citing State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994); and then quoting State v. Curtis, 195 N.J. Super 354, 364–65 (1984)).][8]

---

[8] All the elements of aggravated manslaughter and reckless manslaughter may be proven without proof of a necessary element of vehicular homicide, i.e., that a vehicle caused the death. See N.J.S.A. 2C:11-5(a) ("Criminal homicide constitutes reckless vehicular homicide when it is caused by driving a vehicle . . . recklessly."). Nonetheless, our courts have accepted that vehicular homicide is a lesser-included offense of aggravated manslaughter if the death was caused by an automobile. See State v. Bakka, 176 N.J. 533, 549 (2003); Locane, 454 N.J. at 108, 112; State v. Jiminez, 257 N.J. Super. 567, 583 (App. Div. 1992) ("[A] defendant may be charged with either aggravated manslaughter and/or reckless manslaughter and, in either event, death by auto shall be an included offense."); but see N.J.S.A. 2C:11-5(d) (noting a conviction for vehicular homicide does not preclude a conviction for aggravated manslaughter "if the evidence so warrants"); and State v. Jamerson, 153 N.J. 318, 334 (1998) (noting an earlier amendment to N.J.S.A. 2C:11-5(d) at that time permitted "a conviction for both offenses," manslaughter and death by auto, even though the latter was a lesser-included offense). In any event, both

A defendant's right to have the jury consider a lesser-included offense is axiomatic, because our Court has long held, "No defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense that is clearly indicated in the record." State v. Garron, 177 N.J. 147, 180 (2003). By providing instructions on a lesser-included offense, courts avoid the possibility that a jury "reluctant to acquit [a] defendant might compromise on a verdict of guilt on the greater offense." State v. Sloane, 111 N.J. 293, 299 (1988).

Here, it is undisputed the judge failed to instruct the jury on the lesser-included offense of reckless manslaughter. The evidence could clearly support a jury's finding that defendant acted recklessly, but only with the possibility, as opposed to the probability, of causing another's death. Instead, by only receiving instructions on aggravated manslaughter, the jury faced the all-or-nothing decision whether to acquit or convict defendant of the only charge presented for their consideration in counts one and two, i.e., aggravated manslaughter.

However, this appeal presents an unusual circumstance because of the State's charging decision to indict defendant for both aggravated manslaughter

_____
parties agree vehicular homicide is a lesser-included offense of aggravated manslaughter caused by a vehicle.

and the lesser-included charge of vehicular homicide. The jury convicted him of both. Defendant implied during oral argument this was a deliberate stratagem to avoid lesser-included jury instructions in the context of the charge on aggravated manslaughter. We express no opinion on that assertion.

However, we disagree with the State's contention that any error in failing to charge the jury with reckless manslaughter was harmless. First, while it is undisputed the judge accurately defined the elements of both aggravated manslaughter and vehicular homicide, she did so separately, without mention of any relationship between the two offenses. The verdict sheet directed the jury to return separate verdicts on each crime as to each victim. A properly instructed jury would have understood that it did not face an all-or-nothing decision on the aggravated manslaughter counts of the indictment, but rather it could acquit defendant of those charges and still find him guilty of causing the victims' deaths by returning guilty verdicts, as already noted, as to the lesser-included reckless manslaughter, or on the two counts of vehicular homicide as lesser-included offenses.

Secondly, prior to adoption of 1995 amendments to N.J.S.A. 2C:11-5 that elevated vehicular homicide from a third-degree crime to a second-degree crime, see L. 1995, c. 285, our courts uniformly held there was a difference between the recklessness required for conviction of vehicular homicide, and

the enhanced recklessness required to support a conviction for the then more serious offense of reckless manslaughter. In Jamerson, which involved a pre-amendment crime, 153 N.J. at 325, the Court explained:

> The recklessness required for manslaughter is not the same as that required for death by auto. For reckless manslaughter, the State must prove beyond a reasonable doubt causative acts of recklessness that are different in kind from the acts involved in reckless driving that support a conviction for death by auto. Those additional acts of recklessness must also contribute to causing the death of a victim.
>
> [Id. at 334–35 (citing Jiminez, 257 N.J. Super. at 584).]

"[A] defendant's predriving conduct, such as drinking, and conduct associated with the driving must be so extraordinary and extreme as to satisfy the reckless manslaughter standard." Id. at 335 (citing State v. Scher, 278 N.J. Super. 249, 269 (App. Div. 1994)). "That standard is 'quantitatively greater than the recklessness contemplated in a death-by-auto charge and qualitatively less than the recklessness required to support an aggravated manslaughter case.'" (quoting State v. Milligan, 104 N.J. 67, 73 (1986) (Clifford, J., dissenting)). See also Jiminez, 257 N.J. Super. at 583 (noting trial judges were "require[d] . . . to craft a charge . . . explaining the subtle and sophisticated distinctions between the concept of recklessness envisioned by the Legislature

33

in death by auto as distinguished from the recklessness envisioned in the manslaughter statute").

The model charge for reckless manslaughter continues to recognize this distinction in the level of recklessness required for conviction under N.J.S.A. 2C:11-4(b), and that required for conviction of vehicular homicide under N.J.S.A. 2C:11-5. The charge instructs judges that when "it is alleged that the defendant caused the death of another by operating a motor vehicle," they should "include the following language distinguishing the two offenses." Model Jury Charges (Criminal), "Reckless Manslaughter (N.J.S.A. 2C:11-4(b)(1))" at 1 n.2 (rev. Mar. 22, 2004).

> It is important that you understand the difference between reckless manslaughter and the lesser-included offense of death by auto . . . for which I will soon be providing you with additional instructions. Reckless manslaughter requires proof beyond a reasonable doubt that the defendant drove his/her vehicle . . . recklessly, and also that he/she engaged in additional acts of recklessness, independent of his/her operation of the vehicle . . . that contributed to the victim's death. Death by auto . . . on the other hand, only requires proof beyond a reasonable doubt that the defendant recklessly drove his/her vehicle . . . causing the death of another, and it requires no additional acts of recklessness. Here, the State alleges the following additional acts of recklessness:
>
> (INSERT APPROPRIATE LANGUAGE, AND, WHERE APPROPRIATE ON THE FACTS, SUMMARIZE DEFENDANT'S FACTUAL CONTENTIONS AS WELL)

> Whether the defendant was reckless in his/her operation of the motor vehicle . . . and/or whether the defendant was additionally reckless as alleged by the State is for you the jury to decide based on the evidence in the case. It is only where you are convinced beyond a reasonable doubt that the defendant was in fact reckless both in the operation of the motor vehicle . . . and in the additional manner as alleged by the State that you may convict the defendant of the charge of reckless manslaughter.
>
> [Ibid. (emphasis added) (citation omitted).]

These instructions, however, are not included in the model charge on aggravated manslaughter, nor does that charge provide any guidance for trial judges regarding appropriate instructions when the State has charged a defendant with both aggravated manslaughter and vehicular homicide. See Model Jury Charges (Criminal), "Aggravated Manslaughter (N.J.S.A. 2C:11-4(a))" (rev. Mar. 22, 2004).

One noted commentator, however, has concluded the 1995 amendments to N.J.S.A. 2C:11-5, elevating vehicular homicide to a second-degree offense and permitting separate convictions only for aggravated, not reckless, manslaughter and vehicular homicide, demonstrates the Legislature's intent that vehicular homicide, "rather than reckless manslaughter is the appropriate section to charge." Cannel, New Jersey Criminal Code Annotated, cmt. 3 on

N.J.S.A. 2C:11-5 (2022).[9]  Even if that is so, when the State charges a defendant with aggravated manslaughter by vehicle, as well as vehicular homicide, a court must provide instructions on reckless manslaughter as a lesser-included offense of aggravated manslaughter.  Moreover, since the 1995 amendments, we have "continued to recognize the need to differentiate the degree of recklessness required for reckless manslaughter," and, therefore also aggravated manslaughter, "and death by auto as expressed by State v. Jiminez."  State v. Pigueiras, 344 N.J. Super. 297, 308 (App. Div. 2001) (citing State v. Lane, 288 N.J. Super. 1, 9, 11 (App. Div. 1995); Scher, 278 N.J. Super. at 268–69).

The failure to give the jury instructions on reckless manslaughter was not harmless error for two reasons.  The failure to explain the relationship between aggravated manslaughter caused by a vehicle and the offense of vehicular homicide left the jury with the false belief that the two charges were unrelated.  The jury was not told that an available option was to acquit defendant of the greater charge and convict him of the lesser charge.  The

---

[9]  Prior to the 1995 amendment, N.J.S.A. 2C:11-5(d) provided that "[n]othing herein shall be deemed to preclude . . . an indictment and conviction for manslaughter . . . ."  In addition to elevating vehicular homicide to a second-degree offense, the Legislature amended subsection (d), which now provides, "[n]othing herein shall be deemed to preclude . . . and indictment and conviction for aggravated manslaughter . . . ."

instructions also deprived the jury of an opportunity to understand distinctions in the level of recklessness required to convict defendant of either manslaughter charge versus recklessness that is an element of vehicular homicide. We therefore reverse defendant's convictions for counts one and two and vacate the sentences imposed.[10]

The State has not urged us to mold the jury's verdict and affirm defendant's convictions on count three and four for vehicular homicide if we reversed defendant's convictions for aggravated manslaughter. See State v. R.P., 223 N.J. 521, 525–26 (2015) ("[T]he authority to mold a verdict rests upon a trial court's 'power to enter a judgment of conviction for a lesser included offense where the jury verdict necessarily constitutes a finding that all the elements of the lesser included offense have been established and where no prejudice to the defendant results.'" (quoting State v. Farrad, 164 N.J. 247, 266 (2000))). We do not foreclose the State from moving before the trial judge to dismiss counts one and two and enter an amended judgment of conviction on two counts of vehicular homicide rather than proceed to a new trial. The evidence clearly supported the jury's verdict of guilty on counts three and four.

---

[10] We are forwarding a copy of our opinion to the Supreme Court's Committee on Model Criminal Jury Charges for its consideration of the issues we raise.

IV.

We decline the chance to consider the argument raised in Point III —
whether the State's experts, by expressing their opinions "within a reasonable
degree of scientific certainty," violated defendant's due process rights and
denied him a fair trial. The issue was never raised before the trial judge. See
State v. Witt, 223 N.J. 409, 419 (2015) (noting appellate courts will decline to
consider issues not properly presented to the trial court when opportunity for
such presentation is available).

Nor, considering our disposition, do we address defendant's sentencing
arguments, with one exception. Whether defendant is again convicted after a
new trial, or the trial court grants an application by the State to dismiss counts
one and two and enter judgments of conviction on counts three and four, if the
judge again decides to impose consecutive sentences, she must comply with
the Court's decision in State v. Torres, and provide "[a]n explicit statement,
explaining the overall fairness of a sentence imposed on a defendant for
multiple offenses." 246 N.J. 246, 268 (2021) (citing State v. Miller, 108 N.J.
112, 122 (1987)).

We reverse the judgments of conviction on counts one and two and
vacate the sentences imposed on those counts. We affirm defendant's
convictions on counts three through six and leave to the court's discretion

38

whether the sentences imposed on those counts should be modified as part of any new overall sentencing calculus that may result following further proceedings. See, e.g., State v. Young, 379 N.J. Super. 498, 508 (App. Div. 2005) ("[W]hen the conviction on one or more counts is vacated on appeal, the sentencing court should be able to review what remains of its original sentence plan and to reconstruct the sentence to ensure that the punishment fits both the crime and the criminal." (citing State v. Espino, 264 N.J. Super. 62, 70–71 (App. Div. 1993), remanded in part on other grounds, 188 N.J. 349 (2006))).

Affirmed in part; reversed in part. Remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION